# In the
# United States Court of Appeals
## for the Second Circuit

———

AUGUST TERM 2020

No. 18-163-cr

UNITED STATES OF AMERICA,
*Appellant*,

v.

GERALD SCOTT,
*Defendant-Appellee.*

———

On Appeal from the United States District Court
for the Southern District of New York

———

ARGUED *EN BANC*: NOVEMBER 6, 2020
DECIDED: MARCH 2, 2021

———

Before: LIVINGSTON, *Chief Judge*, LEVAL, CABRANES, POOLER,
KATZMANN, RAGGI, CHIN, LOHIER, CARNEY, SULLIVAN, BIANCO,
PARK, NARDINI, and MENASHI, *Circuit Judges*.*

———

* Judge Hall did not participate in the consideration of this *en banc* appeal. Judge
Leval, Judge Katzmann, and Judge Raggi, who are senior judges, participated in
this en banc decision pursuant to 28 U.S.C. § 46(c) and 28 U.S.C. § 294(c).

1

RAGGI, *J.*, filed the majority opinion in which LIVINGSTON, *C.J.*, CABRANES, CHIN, SULLIVAN, BIANCO, PARK, and NARDINI, *JJ.*, joined in full, and in which MENASHI, *J.*, joined in part.

PARK, *J.*, filed a concurring opinion in which LIVINGSTON, *C.J.*, CABRANES, SULLIVAN, and NARDINI, *JJ.*, joined.

MENASHI, *J.*, filed an opinion concurring in part and concurring in the judgment.

LEVAL, *J.*, filed a dissenting opinion in which KATZMANN, LOHIER and CARNEY, *JJ.*, joined in full, and in which POOLER, *J.*, joined in part.

POOLER, *J.*, filed a dissenting opinion in which LEVAL and CARNEY, *JJ.*, joined as to Parts I–IV.

———————

The United States appeals from an amended judgment entered pursuant to 28 U.S.C. § 2255 in the United States District Court for the Southern District of New York (Swain, *J.*), which vacated defendant's 22-year sentence for Hobbs Act robbery and related firearms crimes and resentenced him to time served (approximately 11 years, 3 months). The district court concluded that it had mistakenly applied the Armed Career Criminal Act ("ACCA"), *see* 18 U.S.C. § 924(e)(1), and the Career Offender Guideline, *see* U.S.S.G. § 4B1.1, in determining Scott's initial sentence because two prior convictions relied on as predicates for those enhancements were for New York first-degree manslaughter, *see* N.Y. Penal Law § 125.20(1), which the district court ruled is not a categorical "violent felony" (ACCA) or "crime of violence" (Guideline). The district court reasoned that first-degree manslaughter does not satisfy these terms' "force clauses" because it is possible to commit that homicide crime by "omission," *i.e.*, by failing to act when one has a duty to do so, *see id.* § 15.00(3).

2

The United States argues that first-degree manslaughter is a categorical violent felony/crime of violence because a person can be guilty of that crime—whether by commission or omission—only if he (a) causes death, while (b) intending to cause at least serious bodily injury, *see id.* § 125.20(1), and the Supreme Court has stated that "the knowing or intentional causation of bodily injury necessarily involves the use of physical force," *United States v. Castleman*, 572 U.S. 157, 169 (2014). This court agrees.

REVERSED in part, VACATED in part, and REMANDED.

––––––––––

WON S. SHIN (Catherine E. Ghosh, *on the brief*), Assistant United States Attorneys, *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY, *for Appellant.*

MATTHEW B. LARSEN, Federal Defenders of New York, New York, NY, *for Defendant-Appellee.*

Alan E. Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY; Samuel C. Leifer, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA; Peter Goldberger, Ardmore, PA, *for amicus curiae FAMM.*

Alan E. Schoenfeld, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY; Samuel C. Leifer, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA;

Richard D. Willstatter, Green & Willstatter, White Plains, NY, *for amicus curiae Counsel for New York State Association of Criminal Defense Lawyers*.

Thomas C. Goldstein, Goldstein & Russell, P.C., Bethesda, MD, *for amici curiae National Association for Public Defense, Arizona Attorneys for Criminal Justice, the Human Rights Defense Center, the Illinois Association of Criminal Defense Lawyers, the National Association of Criminal Defense Lawyers, the National Legal Aid & Defender Association, and the Office of the Defender General in Vermont*.

---

REENA RAGGI, *Circuit Judge*, joined by Debra Ann Livingston, *Chief Judge*, José A. Cabranes, Denny Chin, Richard J. Sullivan, Joseph F. Bianco, Michael H. Park, William J. Nardini, *Circuit Judges*, and joined in part by Steven J. Menashi, *Circuit Judge*.

**INTRODUCTION**

Defendant-appellee Gerald Scott is a violent criminal, who has repeatedly threatened, and on two occasions taken, human life. The killings were undoubtedly brutal: Scott shot one of his victims in the head at point-blank range; he stabbed the other to death. For these killings, Scott stands twice convicted in New York State of first-degree manslaughter under N.Y. Penal Law § 125.20(1), a homicide crime second only to murder in its severity.[1] At issue on this appeal is

---

[1] *Compare* N.Y. Penal Law § 125.20(1) ("A person is guilty of manslaughter in the first degree when . . . [w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third person[.]"), *with id.* § 125.25(1) ("A person is guilty of murder in the second degree when . . . [w]ith

4

whether Scott's manslaughter convictions are for violent crimes. An affirmative answer might appear obvious to a man on the street aware of Scott's conduct. But the laws relevant here—the Armed Career Criminal Act ("ACCA"), *see* 18 U.S.C. § 924(e)(2)(B), and the Career Offender Sentencing Guideline, *see* U.S.S.G. § 4B1.2(a)—do not identify violent crimes by looking to what a defendant actually did. Rather, they look to the minimum he might have done and still been convicted. This inquiry focuses on a crime's elements, asking whether they categorically require a defendant's use of physical force, specifically violent physical force. *See Curtis Johnson v. United States*, 559 U.S. 133, 140, 144 (2010) (defining physical force required by ACCA).[2] Applying that standard here, we conclude that first-degree

---

intent to cause the death of another person, he causes the death of such person or of a third person[.]").

New York's first-degree manslaughter statute, *id.* § 125.20, is divisible into its enumerated parts. *See United States v. Castillo*, 896 F.3d 141, 150 (2d Cir. 2018). Because the record shows, and all parties agree, that Scott's two manslaughter convictions were pursuant to § 125.25(1), that is the only part we address in this opinion and, hereafter, when we use the term "first-degree manslaughter," we refer only to that part, unless otherwise indicated.

[2] ACCA defines a "violent felony" as "any crime punishable by imprisonment for a term exceeding one year" that,

(i) *has as an element the use, attempted use, or threatened use of physical force against the person of another*; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]

18 U.S.C. § 924(e)(2)(B) (emphasis added).

The Career Offender Guideline defines a "crime of violence" as a federal or state felony that,

manslaughter is a categorically violent crime because its elements—
(1) the causation of death (2) by a person intent on causing at least
serious physical injury—necessarily involve the use of violent force.

The occasion for our ruling is the United States' appeal from an
amended judgment of conviction entered on January 12, 2018, in the
United States District Court for the Southern District of New York
(Laura Taylor Swain, *Judge*), which resentenced Scott to time served
(then totaling approximately 11 years, 3 months) for attempted Hobbs
Act robbery and related firearms crimes. Resentencing followed the
district court's grant of Scott's 28 U.S.C. § 2255 motion to vacate his
original 22-year sentence. *See United States v. Scott*, No. 06 CR 988-
LTS, 2017 WL 2414796, at *3 (S.D.N.Y. June 2, 2017). The district court
concluded that it had mistakenly relied on ACCA and the Career
Offender Guideline in imposing Scott's initial sentence. It reasoned
that Scott's two prior convictions for first-degree manslaughter did
not qualify as predicate violent crimes because "first degree
manslaughter can be committed in New York State by *omission* and

---

(1) *has as an element the use, attempted use, or threatened use of physical force against the person of another*; or

(2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

U.S.S.G. § 4B1.2(a) (emphasis added).

In this opinion, we focus on the highlighted, identically worded "force clauses," and we use the term "violent crime" to refer to both an ACCA "violent felony" and a Guideline "crime of violence" as defined in these clauses. Similarly, references to "use" of physical force in this opinion are intended to include attempted and threatened, as well as actual, use.

thus without using force."  *Id.* at *2 (emphasis added).[3]  A divided
panel of this court agreed, with the majority analogizing omission to
"complete inaction," and concluding therefrom that the crime could
be committed without the use of force.  *See United States v. Scott*, 954
F.3d 74, 78 (2d Cir. 2020) (holding first-degree manslaughter "not a
predicate crime of violence because it can be committed by complete
inaction and therefore without the use of force").

After rehearing the case *en banc*, we reject this reasoning, which,
carried to its logical—or illogical—conclusion, would preclude courts
from recognizing even intentional murder as a categorically violent
crime because, presumably, it is just as possible for a defendant to
cause a person's death by omission when the defendant's specific
intent is to kill, *see* N.Y. Penal Law § 125.25(1) (second-degree
murder), as when his specific intent is to cause serious physical injury,
*see id.* § 125.20(1) (first-degree manslaughter).  We decline to take the
law down a path leading so far from the violent reality of these two
most serious, intentionally injurious homicide crimes.

Indeed, we find that path foreclosed by the Supreme Court's
decision in *United States v. Castleman*, 572 U.S. 157 (2014).  The
Supreme Court there stated that the "knowing or intentional
causation of bodily injury *necessarily* involves the use of physical
force."  *Id.* at 169 (emphasis added).  Because New York first-degree
manslaughter can only be committed by a defendant who causes
death—the ultimate bodily injury—while intending to cause at least

---

[3] New York defines "omission" as the "failure to perform an act as to which a duty
of performance is imposed by law."  N.Y. Penal Law § 15.00(3).

serious physical injury,[4] the crime necessarily involves the use of physical force.

Nor is a different conclusion warranted by the possibility of New York first-degree manslaughter being committed by omission. First, to the extent that the use of physical force implies some action by a defendant, the criminal law recognizes an omission as "affirmative action" in identifying criminal culpability. 2 Wayne R. LaFave, *Substantive Criminal Law* § 15.4(b), at 717 (3d ed. 2018) (hereinafter "LaFave"); *see infra* at 24, 33–35. Second, in *Castleman*, the Supreme Court explained that a defendant's use of force does not depend on his own actions in initiating or applying injurious force. What matters is that he knowingly employed or availed himself of physical force as a device to cause intended harm. 572 U.S. at 171 (explaining that, in poisoning scenario, "use of force" is "not the act of sprinkling the poison; it is the act of employing poison knowingly as a device to cause physical harm" (brackets and internal quotation marks omitted)); *see also Villanueva v. United States*, 893 F.3d 123, 128 (2d Cir. 2018) (following *Castleman*, "use of force" inquiry "focuses on the causation of a consequence, rather than the physical act of initiating an action that leads to a consequence"). A defendant can do that as much by omission as by commission in committing first-degree manslaughter. That is because, when a defendant causes death by breaching a legal duty to check or redress violent force *because* he intends thereby for that force to cause serious physical injury, what he is doing is making that force his own injurious

---

[4] *See* N.Y. Penal Law § 10.00(10) (defining "[s]erious physical injury" as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ").

instrument. Six of our sister circuits agree that crimes intentionally causing physical injury are categorically violent even if committed by omission.[5]

In sum, after reviewing the matter *en banc*, this court identifies New York first-degree manslaughter as a categorically violent crime under the force clauses of ACCA and the Career Offender Guideline. Accordingly, we vacate the panel decision, reverse the district court's grant of Scott's § 2255 motion, vacate the reduced sentence reflected in the amended judgment, and remand the case to the district court with directions to reinstate Scott's original sentence and judgment.

## BACKGROUND

I. **Scott's Federal Crimes of Conviction and Violent Criminal History**

Whether first-degree manslaughter in violation of New York Penal Law § 125.20(1) is a violent crime is a question that here arises in the context of determining the appropriate sentence for Scott's latest conviction for three federal crimes to which he pleaded guilty:

---

[5] *See United States v. Rumley*, 952 F.3d 538, 549–51 (4th Cir. 2020) (rejecting argument that defendant need not use violent force to commit physically injurious crime (Virginia unlawful wounding) by omission); *United States v. Báez-Martínez*, 950 F.3d 119, 130–33 (1st Cir. 2020) (same re: Puerto Rico attempted murder); *United States v. Sanchez*, 940 F.3d 526, 533–36 (11th Cir. 2019) (same re: New York second-degree murder); *United States v. Peeples*, 879 F.3d 282, 286–87 (8th Cir. 2018) (same re: Iowa attempted murder); *United States v. Ontiveros*, 875 F.3d 533, 536–38 (10th Cir. 2017) (same re: Colorado second-degree assault); *United States v. Waters*, 823 F.3d 1062, 1066 (7th Cir. 2016) (same re: Illinois domestic battery). *But see United States v. Mayo*, 901 F.3d 218, 227, 229–30 (3d Cir. 2018) (concluding that Pennsylvania aggravated assault is not categorically violent crime because "bodily injury is [not] always and only the result of physical force," but describing conclusion as "wholly unsatisfying and counterintuitive"). The continued viability of *Mayo*'s holding is under *en banc* review in *United States v. Harris*, No. 17-1861 (3d Cir.) (argued Oct. 16, 2019).

attempted Hobbs Act robbery, *see* 18 U.S.C. § 1951; brandishing a firearm during that robbery, *see id.* § 924(c)(1)(A)(ii); and, at the same time, being a previously convicted felon in possession of a firearm, *see id.* §§ 922(g)(1), 924(e). Scott committed these crimes on September 26, 2006, when he entered a Bronx jewelry store, pointed a gun at the store owner, and ordered him to surrender the contents of his cash register. The robbery, and any possible ensuing injury, were thwarted only by the fortuitous intervention of a police officer.

This is Scott's fourth conviction for felony crimes committed by threatening—and on two occasions taking—human life. In 1983, Scott was convicted of first-degree robbery, *see* N.Y. Penal Law § 160.15, during which crime he held a 75-year-old man at knifepoint. Then, in 1988, Scott was twice convicted of New York first-degree manslaughter. *See id.* § 125.20(1). On one occasion, he fatally shot the victim in the head at point-blank range. On the other occasion, he stabbed the victim to death.

### A. Scott's Initial Sentence

Judged simply by his own brutal conduct, Scott is clearly a persistently violent felon. In sentencing Scott for his most recent federal crimes, the district court was certainly entitled—and, indeed, required—to consider his violent criminal history. *See* 18 U.S.C. § 3553(a)(1) (stating that court, in determining sentence "shall consider," *inter alia*, "the history and characteristics of the defendant"); *id.* § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). That history was relevant, at a minimum, to assessing the seriousness of Scott's most recent crimes. It was also relevant to the

10

likelihood of his committing future crimes, and to the danger—life-threatening danger—that might be posed to innocent persons from such crimes. *See id.* § 3553(a)(2)(A), (C).

At the same time, however, the law sometimes requires specific findings to trigger particular sentencing consequences. Thus, to apply a "Career Offender" enhancement to Scott's Sentencing Guidelines calculation, the district court was required to find that he had two or more felony convictions for a "crime of violence" or a "controlled substance offense." U.S.S.G. § 4B1.1(a).[6] Similarly, to impose ACCA's fifteen-year mandatory minimum sentence for Scott being a felon in possession of a firearm, the court had to find that he had three or more prior "violent felony" or "serious drug offense" convictions. 18 U.S.C. § 924(e)(1).[7]

At Scott's initial sentencing, the district court concluded—with no objection and, therefore, little discussion—that Scott warranted sentencing enhancements under both ACCA and the Career Offender Guideline based on his 1983 conviction for robbery and his two 1988 convictions for first-degree manslaughter. Accordingly, on April 16,

---

[6] The Career Offender Guideline raises a defendant's criminal history category in every case to level VI and raises his offense level to specified degrees depending on the statutory maximum for his crime of conviction. *See* U.S.S.G. § 4B1.1(b). In Scott's case—without factoring in the ACCA enhancement—the Guideline raised his offense level from 17 to 29, his criminal history category from IV to VI, and his Guidelines prison range from 121–130 months to 264–327 months.

[7] Without the ACCA enhancement, a person convicted of being a felon in possession of a firearm faces a sentence of between 0 and 10 years. *See* 18 U.S.C. § 924(a)(2) (prescribing sentence of "not more than 10 years"). With the enhancement, he faces a sentence of 15 years to life. *See id.* § 924(e)(1) (prescribing sentence of "not less than fifteen years"); *Welch v. United States*, 136 S. Ct. 1257, 1261 (2016) (construing ACCA to establish "minimum sentence of 15 years and a maximum sentence of life in prison").

2008, the district court sentenced Scott to a total prison sentence of 22 years. This sentence, at the bottom of Scott's Career Offender enhanced 264-to-327 month Guidelines range, reflected the ACCA-mandated 15-year term on the felon-in-possession count, a concurrent 15-year term for the attempted Hobbs Act robbery count, and a separately-mandated consecutive 7-year term for brandishing a firearm. *See* 18 U.S.C. § 924(c)(1)(A)(ii). Scott's direct appeal from this conviction was dismissed as untimely in 2012. *See United States v. Scott*, No. 10-3689 (2d Cir. Dec. 19, 2011), ECF No. 63.

## B. Section 2255 Vacatur and Resentencing

In 2016, with this court's leave, Scott filed a collateral challenge to his sentence pursuant to 28 U.S.C. § 2255, arguing that the ACCA and Career Offender Guideline enhancements were mistakenly applied.[8] Scott did not—and could not—dispute that his robbery conviction was a violent-crime predicate under ACCA and the Career Offender Guideline. *See Stuckey v. United States*, 878 F.3d 62, 70–72 (2d Cir. 2017) (holding New York first-degree robbery categorical violent felony under ACCA). Instead, he argued that his two first-degree manslaughter convictions did not qualify as predicates because that crime was not categorically violent under either (1) the ACCA and Career Offender Guideline force clauses, or (2) ACCA's now-invalidated residual clause. *See Samuel Johnson v. United States*, 576 U.S. 591, 606 (2015) (holding ACCA residual clause unconstitutionally vague).

---

[8] This was Scott's second § 2255 petition, the district court having already rejected as untimely and meritless his first § 2255 challenge to his sentence based on a claim of ineffective assistance of counsel. *See Scott v. United States*, No. 10 CIV 3488-LTS, 2011 WL 812069, at *1–4 (S.D.N.Y. Mar. 3, 2011).

The government disputed only the first point. The district court, however, agreed with Scott, ruling that first-degree manslaughter is not a categorical violent felony because it can be committed "by an act of omission, which by definition does not involve an act of any kind, let alone the use of force." *United States v. Scott*, 2017 WL 2414796, at \*2. Accordingly, finding that it should not have applied ACCA's mandatory minimum to Scott's felon-in-possession count of conviction, the district court vacated his initial sentence.

On resentencing, the district court employed the same reasoning to conclude that first-degree manslaughter was not a crime of violence under the Career Offender Guideline's identical force clause. Nor was first-degree manslaughter a crime of violence under the Guideline's enumerated offenses clause because, in the district court's view, it did not fit within the generic definitions of "murder," "voluntary manslaughter," or "aggravated assault." U.S.S.G. § 4B1.2(a)(2) (quoted *supra* note 2). Recalculating Scott's Guidelines range without the Career Offender enhancement as 121 to 130 months, the district court imposed an amended sentence of time served, which then amounted to approximately 135 months, or 11 years and 3 months.[9]

On the government's appeal, a divided panel affirmed. Identifying an "omission" as the minimum criminal conduct required

---

[9] Given that the brandishing-a-firearm count of conviction carried a mandatory minimum consecutive 7-year prison term, *see* 18 U.S.C. § 924(c)(1)(A)(ii), it appears that the district court sentenced Scott to concurrent 51-month terms on the Hobbs Act robbery and felon-in-possession counts. We do not here consider whether such a sentence reduction is substantively unreasonable, *see*, Leval, *J.*, Dissenting Op., *post* at 3 (raising possibility), because the government does not appeal the sentence on that ground.

for first-degree manslaughter, *United States v. Scott*, 954 F.3d at 80–83, the majority concluded that a crime that could be committed by "complete inaction," *i.e.*, by "taking no action whatsoever," did "not have as an element the use of physical force against the person of another" as required to qualify as a violent felony or crime of violence under the ACCA and Career Offender Guideline force clauses, *id.* at 87 (ellipsis and internal quotation marks omitted). The panel majority further concluded that first-degree manslaughter was not a crime of violence under the Guideline's enumerated offenses clause because a majority of states did not punish its minimum conduct as murder, voluntary manslaughter, or aggravated assault. *See id.* at 88–92 (concluding that majority of states had to agree as to one of these crimes).

The panel's dissenting member questioned the realistic probability of New York prosecuting first-degree manslaughter in circumstances where a defendant took no physical action whatsoever. *See id.* at 99–102 (Raggi, *J.*, dissenting). But even assuming that probability, the dissent maintained that first-degree manslaughter was a categorically violent crime because conviction required the defendant (1) to have caused death while (2) intending to cause at least serious physical injury, and the Supreme Court has recognized that the "intentional causation of bodily injury *necessarily* involves the use of physical force." *Id.* at 102 (emphasis in dissent) (quoting *United States v. Castleman*, 572 U.S. at 169). Moreover, the dissent identified first-degree manslaughter as a categorical crime of violence under the Guideline's enumerated offenses clause because the minimum conduct for conviction, as reflected in its two elements, was recognized by a majority of states as either murder or the lesser-included crime of voluntary manslaughter, and by a majority of states as aggravated assault. *See id.* at 105–08 (concluding that murder and

14

voluntary manslaughter could be considered together in identifying state majority).

Following the panel's affirmance, and before the issuance of any mandate, a majority of this court's active judges voted to rehear the case *en banc.* *See* Fed. R. App. P. 35(a).

## DISCUSSION

I.  **"Violent Felony" and "Crime of Violence" Under the ACCA and Career Offender Guideline Force Clauses**

Whether an offense is a "violent felony" or a "crime of violence" under ACCA and the Career Offender Guideline is a question of law that this court decides *de novo.* *See United States v. Moore*, 916 F.3d 231, 236 (2d Cir. 2019); *United States v. Bordeaux*, 886 F.3d 189, 192 (2d Cir. 2018).  In doing so here, we look to the definitions of these terms as stated in the ACCA and Guideline force clauses.  *See supra* note 2 (quoting clauses).  Because the clauses are identically worded, a single analysis suffices to explain our conclusion that first-degree manslaughter in violation of New York Penal Law § 125.20(1) is a violent crime under both ACCA and the Career Offender Guideline.  *See United States v. Evans*, 924 F.3d 21, 29 n.4 (2d Cir. 2019) (stating that we "look[] to cases analyzing ACCA's elements clause to interpret . . . § 4B1.2 of the Guidelines"); *United States v. Moore*, 916 F.3d at 241–42 (relying on cases construing ACCA's force clause in construction of Guideline counterpart).

The force clauses define a violent crime by asking whether the crime "has as an element the use, attempted use, or threatened use of physical force against the person of another."  *See supra* note 2.  We look to state law in identifying the elements of a crime, but to federal law in determining "whether the consequences of the conduct that

15

those elements require[] . . . render[] conviction for that conduct a 'violent [crime]' under federal law." *Villanueva v. United States*, 893 F.3d at 129. This process triggers a categorical inquiry to determine the minimum criminal conduct necessary to satisfy the elements of a crime, without regard to whether the defendant himself engaged in more egregious conduct. *See United States v. Stitt*, 139 S. Ct. 399, 405 (2018) (instructing that categorical inquiry requires answer "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion" (internal quotation marks omitted)); *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016) (describing "modified" categorical approach for divisible statutes); *United States v. Hill*, 890 F.3d 51, 55 (2d Cir. 2018) (collecting cases discussing categorical approach). A court must then decide whether a necessary component of that minimum conduct is the defendant's use of physical force. *See United States v. Hill*, 890 F.3d at 56. The term "physical force" as used in ACCA means "*violent* force," *i.e.*, "force capable of causing physical pain or injury to another person." *Curtis Johnson v. United States*, 559 U.S. at 140 (emphasis in original) (construing ACCA's force clause); *see United States v. Reyes*, 691 F.3d 453, 458 & n.1 (2d Cir. 2012) (applying same standard in defining "crime of violence" under U.S.S.G. § 4B1.2(a)).[10]

## II. Prosecuting First-Degree Manslaughter by "Omission"

The two elements of first-degree manslaughter are readily identified in the text of N.Y. Penal Law § 125.20(1). The first element—which identifies the applicable *mens rea*—requires that a

---

[10] Our concurring colleague, Judge Park, criticizes the categorical approach. *See* Park, *J.*, Concurring Op., *post* at 1. Nevertheless, as Judge Park acknowledges, we are obliged to follow it here, and we do so strictly according to its dictates.

16

defendant "inten[d] to cause serious physical injury to another person," *id.*, that is, "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ," *id.* § 10.00(10) (defining "serious physical injury"). The second element—which identifies the *actus reus*—requires that a defendant, possessed of such seriously injurious intent, in fact "cause[] the death" of either the person he intended to injure or a third person. *Id.* § 125.20(1).

Thus, the minimum conduct necessary to commit the crime is the causation of death by a person intent on causing serious physical injury. Scott argues, and the district court agreed, that a person's death can be caused by omission, which New York defines as the "failure to perform an act as to which a duty of performance is imposed by law." *Id.* § 15.00(3). The district court went on to conclude—as Scott now urges this court to do—that a crime that can be committed by omission, even a homicide crime committed with specific injurious intent, is not categorically violent because "omission . . . by definition does not involve an act of any kind, let alone the use of force." *United States v. Scott*, 2017 WL 2414796, at *2; *see* Appellee Br. at 12, 14 (submitting that crime can be committed by omission by "[s]itting still in a chair," which "is no use of physical force against the person of another" (internal quotation marks omitted)). In so ruling, the district court acknowledged that, in *United States v. Castleman*, the Supreme Court stated that "the knowing or intentional causation of bodily injury necessarily involves the use of physical force," 572 U.S. at 169. But the district court deemed *Castleman* irrelevant to Scott's case because neither the ACCA force clause nor crimes committed by "inaction" were there at issue. *United States v. Scott*, 2017 WL 2414796, at *2. Thus, the district court relied instead

17

on this court's earlier pronouncement in *Chrzanoski v. Ashcroft*, holding that "the intentional causation of injury does *not* necessarily involve the use of force," 327 F.3d 188, 195 (2d Cir. 2003) (emphasis added), to grant Scott relief from his original sentence.

This was error, though perhaps not recognizable to the district court at the time, insofar as its ruling predated this court's clear pronouncement in *Villanueva v. United States* that *Chrzanoski*'s understanding of "use of force" was "abrogated" by *Castleman*. 893 F.3d at 130; *see also United States v. Hill*, 890 F.3d at 60 (observing that "*Chrzanoski* panel did not have the benefit of the Supreme Court's reasoning in *Castleman*"). Apparently, *Villanueva* did not make the point clearly enough, however, because Scott maintains—incorrectly—that *Chrzanoski* remains good law with respect to crimes that can be committed by omission. He reasons that omission is "inaction," "literally no conduct," whereas "use" requires some "physical act" by a defendant to initiate or apply force. Appellee Br. at 14, 20. On this basis, Scott submits that first-degree manslaughter cannot be identified as a categorically violent crime under the ACCA and Career Offender Guideline force clauses.

### A.  Assuming the "Realistic Probability" of Prosecuting First-Degree Manslaughter by Omission

In making this argument, Scott bears a double burden. At the threshold, he must demonstrate not only that it is theoretically *possible* to prosecute first-degree manslaughter in circumstances of complete inaction, but also that it is realistically *probable* that New York would so apply its law. *See United States v. Hill*, 890 F.3d at 56; *Stuckey v. United States*, 878 F.3d at 67. This requirement serves to ensure that defendants, such as Scott, who undeniably used violence to commit their past crimes of conviction, do not escape being denominated

violent felons simply by hypothesizing some non-violent scenario—such as causing death while simply "[s]itting still in a chair," *see* Appellee Br. at 12—that might satisfy a crime's statutory elements, but that is nowhere reflected in caselaw.  Thus, to carry the realistic-probability burden, a defendant "must at least point to his own case or other cases in which [New York] courts *in fact* did apply the statute in the manner for which he argues."  *United States v. Hill*, 890 F.3d at 56 (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007) (emphasis added and ellipses omitted)); *see also Moncrieffe v. Holder*, 569 U.S. 184, 206 (2013) (holding that "realistic probability" requires showing that "State actually prosecutes the relevant offense" in non-violent circumstances hypothesized).[11]  If Scott can clear that threshold, he must then show that first-degree manslaughter, when committed by omission, does not necessarily involve a defendant's use of force.

Scott points to three New York State cases to satisfy his threshold burden: *People v. Steinberg*, 79 N.Y.2d 673, 680, 584 N.Y.S.2d 770, 772 (1992) (upholding conviction of adoptive father prosecuted on theories of both commission and omission for brutally beating six-year old child and leaving her to die); *People v. Wong*, 81 N.Y.2d 600, 607, 601 N.Y.S.2d 440, 443–44 (1993) (reversing couple's manslaughter convictions on theories of both commission and omission for insufficient evidence relating to shaken-baby-syndrome death of infant in their care, although citing *Steinberg* in acknowledging

---

[11] The "realistic probability" standard first articulated in *Gonzales v. Duenas-Alvarez*, and reiterated in *Moncrieffe v. Holder*, was there applied to determine aliens' removability under the Immigration Nationality Act.  In subsequent cases, this court applied that standard, and the reasoning of those cases, in the ACCA and Guidelines contexts.  *See United States v. Moore*, 916 F.3d at 240 (Career Offender Guideline); *Stuckey v. United States*, 878 F.3d at 67 (ACCA).

"theoretical[]" possibility of establishing guilt by omission); and—
cited for the first time to the *en banc* court—*People v. Santiago*, 87
A.D.3d 707, 708, 928 N.Y.S.2d 602, 603–04 (2d Dep't 2011) (upholding
first-degree manslaughter conviction of mother who prompted
enraged husband with history of child abuse to question her child
about suspected misdeed, and who then failed to intervene or secure
help when husband fatally beat child[12]).  Whether these cases suffice
to satisfy Scott's "realistic probability" burden is a question that
sharply divided the panel that first heard this appeal.[13]  The panel
decision in Scott's favor on this point is now vacated, and the *en banc*
court, while adhering to the reasonable probability standard stated in
*United States v. Hill*, need not decide if *Scott* satisfies it here for two
reasons.  First, the government has abandoned its realistic-probability
challenge before the *en banc* court.  *See United States v. Black*, 918 F.3d
243, 256 (2d Cir. 2019) (stating "argument not raised on appeal is
deemed abandoned," and will not be considered "unless manifest

---

[12] *Santiago*'s relevancy here is doubtful in that the conviction there was obtained
pursuant to a different part of the first-degree manslaughter statute not here at
issue, N.Y. Penal Law § 125.20(4) (added to statute in 1990 and pertaining to adults
who "with intent to cause physical injury to a person less than eleven years old,
. . . recklessly engage[] in conduct which creates a grave risk of serious physical
injury to such person and thereby cause[] the death of such person").  Further, to
the extent the mother's speech might be understood to have precipitated the
child's fatal beating, Scott himself suggested at oral argument that speech can
satisfy his urged physical act requirement for use of force.  *See* Tr. Nov. 6, 2020, at
77.

[13] *Compare United States v. Scott*, 954 F.3d at 83 (concluding that Court of Appeals'
*Steinberg* ruling (reiterated in *Wong*) that first-degree manslaughter can be
committed by omission, together with its affirmance of *Steinberg* defendant's
conviction on theory of omission as well as commission, satisfied realistic
probability requirement), *with id.* at 99–102 (Raggi, *J.,* dissenting) (observing that
in neither *Steinberg* nor *Wong* were defendants in fact prosecuted on theories of
omission based on no physical action; rather, defendants' acts of omission were
linked to their physical acts).

injustice otherwise would result" (internal quotation marks omitted)). Second, even if we assume that New York would apply the first part of its first-degree manslaughter statute in circumstances where a defendant engaged in no physical action at all, the elements of the crime would still *necessarily* involve a defendant's use of force. We proceed to explain that conclusion.

### B. First-Degree Manslaughter Necessarily Involves the Use of Violent Force

As already observed, a person commits first-degree manslaughter under New York law when, (1) "[w]ith intent to cause serious physical injury to another person," (2) "he causes the death of such person or of a third person." N.Y. Penal Law § 125.20(1). As these elements indicate, a defendant need not intentionally cause death to be guilty of this homicide crime. But he must cause death while intending to cause serious physical injury, *i.e.*, injury that "creates a substantial risk of death," or that, in fact, "causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." *Id.* § 10.00(10). To do that, a defendant must use violent force.

### 1. The Elements of First-Degree Manslaughter Require a Defendant's Use of Violent Force

To explain, we begin with what Scott himself acknowledged at oral argument: any death amounting to first-degree manslaughter necessarily results from violent force. *See* Tr. Nov. 6, 2020, at 57. It follows, then, that the person who *caused* that death—the *actus reus* element of first-degree manslaughter—is the person who used the violent force producing that fatal result. How does one identify that person? The *mens rea* element of the crime answers the question. It requires that a person intend to cause, if not death, then at least

21

serious physical injury. A defendant possessed of such intent can only achieve *that* object by using violent force. Thus, it is when violent force that a defendant was using to cause intended serious injury results, instead, in death that the law recognizes the defendant to have caused that death and, therefore, to have committed first-degree manslaughter. In sum, the *causation* element of first-degree manslaughter, considered in light of the crime's *mens rea* element, requires that, in every case, a defendant's knowing and intentional use of violent force be the cause of death.

The possibility of a defendant committing the crime by omission warrants no different conclusion. The word "use"—which we here construe in the context of a use of violent force, *see Smith v. United States*, 508 U.S. 223, 229 (1993) (recognizing that word "use" must be construed in context)—does not require (as Scott maintains) that a defendant take affirmative physical action to initiate or apply the violent force resulting in death. Rather, as the Supreme Court observed in *Smith*, the "ordinary," "natural," "everyday meaning" of the word "use" requires only that a person "make use of" the violent force, "convert [such force] to one's service," "employ [it]," "avail oneself of [it]," "utilize [it]," "carry out a purpose or action by means of [it]," or "derive service from [it]." *Id.* at 228–29 (internal quotation marks omitted) (citing ordinary meaning of "use" before construing word in context of firearm use proscribed by 18 U.S.C. § 924(c)); *see Voisine v. United States*, 136 S. Ct. 2272, 2278–79 & n.3 (2016) (citing approvingly to *Smith* in relying on dictionary definitions of "use" in construing force clause of 18 U.S.C. § 921(a)(33)(A)).[14]

---

[14] Our concurring colleague, Judge Menashi, faults the Supreme Court in *Smith* for substituting "possible" for "prototypical" meanings in defining "use." Menashi, *J.*, Concurring Op., *post* at 5. We are not persuaded. *Smith*'s definitions of "use"

22

As the Supreme Court has recognized, these quoted definitions are expansive, indicating that when Congress employs the word "use" in a statute, its intent is to "sweep[] broadly" and not to cabin legislation only to those uses "that most immediately come[] to mind" or that manifest a defendant's "active[]," *i.e.*, physical, use. *Smith v. United States*, 508 U.S. at 229–30 (citing approvingly to *United States v. Long*, 905 F.2d 1572, 1576–77 (D.C. Cir. 1990), in which now-Justice Thomas stated that "although not without limits, the word 'use' is 'expansive' and extends even to situations where the gun is not actively employed"). That conclusion applies as much when "use" pertains to violent force as when it pertains to a firearm. Indeed, if there is a common principle running through these definitions that limits their reach, it is not that "use" must be physical but, rather, that it must be conscious. *See, e.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (stating that "use . . . of physical force" against another person suggests higher degree of intent than negligence or accidental conduct (internal quotation marks omitted)) (discussed further *infra*

derive from oft-cited dictionaries, *see* Webster's New International Dictionary 2806 (2d ed. 1939); Black's Law Dictionary 1541 (6th ed. 1990), and long-standing precedent, *see Astor v. Merritt*, 111 U.S. 202, 213 (1884) (recognizing "use" as "derive service from"). *See Smith v. United States*, 508 U.S. at 228–29. Such tools are routinely used by courts to identify the ordinary meaning of statutory terms. *See, e.g.*, *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018). But even if sources cited by our colleague—illustrative entries from the Corpus of Contemporary American English and a Canadian newspaper headline, s*ee* Menashi, *J.*, Concurring Op., *post* at 5 & nn.7, 8—were sufficient to cast doubt on *Smith*'s identification of the ordinary meaning of "use," the case nevertheless controls this court. That conclusion is reinforced by the fact that, even if Justice Ginsburg may have been willing to overrule *Smith* (a point highlighted by our colleague), the Supreme Court has expressly declined to do so, *see Watson v. United States*, 552 U.S. 74, 82–83 (2007); *id.* at 83–84 (Ginsburg, *J.*, concurring), and continues to cite approvingly to *Smith* and to its definitions of "use," *see Voisine v. United States*, 136 S. Ct. at 2278 n.3. Thus, we rely on those definitions here.

23

at 42–44). *See also United States v. Castleman*, 572 U.S. at 169 ("[T]he *knowing or intentional* causation of bodily injury necessarily involves the use of physical force." (emphasis added)) (discussed further in the next sub-section of this opinion). [15]

To the extent the Court has recognized (again in the context of firearms) that the ordinary definitions of "use" imply some "action and implementation" by a defendant that go beyond mere possession, *Bailey v. United States*, 516 U.S. 137, 145 (1995), omission—the breach of a legal duty to act—provides any necessary action. As we explain in some detail *infra* at 33–35, "omission" has a specialized meaning at law, which equates not to *inaction*, but to *action* supporting criminal culpability. *See* 2 LaFave § 15.4(b), at 717 (observing that omission equates to "affirmative action" in identifying culpability). Indeed, it is the action that can establish causation for crimes such as murder and manslaughter, which as Scott acknowledges, necessarily result from violent force. *See* Tr. Nov. 6, 2020, at 57; 1 LaFave § 6.2, at 589–90 (identifying murder and manslaughter as crimes defined in terms of cause and effect that can, in appropriate circumstances, be committed by omission).

Not insignificantly, the New York Court of Appeals relied on this specialized meaning in ruling that first-degree manslaughter can be committed by omission. *See People v. Steinberg*, 79 N.Y.2d at 680 ("The Penal Law provides that criminal liability may be based on an

---

[15] Thus, even if one would not ordinarily say that a person is using physical force whenever she drives a car, *see* Menashi, *J.*, Concurring Op., *post* at 5, one would easily say just that when the person drives the car into a crowd *because* she intends thereby to cause one or more persons in the crowd serious physical injury. In those circumstances, the driver is employing the car's force not simply to transport her from one place to another, but as her instrument for causing intended injury. On that much, we understand even Scott to agree.

omission . . . ."); N.Y. Penal Law § 15.00(5) (stating "'[t]o act' means either to perform an act or to omit to perform an act"). By contrast, the district court appears to have overlooked omission's specialized meaning and simply to have assumed the word meant inaction. *See United States v. Scott*, 2017 WL 2414796, at *2. Meanwhile, Scott embraces each position as best serves his interests. He relies on the specialized meaning of omission to argue at the threshold of the categorical inquiry that *Steinberg* shows that first-degree manslaughter can be committed by omission. *See* Tr. Nov. 6, 2020, at 80 (acknowledging that legal definition of omission is necessary to satisfy causation element of first-degree manslaughter). But, he then repeatedly refers to omission as inaction to insist that manslaughter by omission does not involve any use of force under ACCA. *See* Appellee Br. at 14–17. Scott provides no rationale for inconsistently construing the same word at different steps in the categorical analysis.

No matter. In construing ACCA, we assume that when Congress identified violent crimes by reference to an element requiring a use of force, it legislated against the common law background recognizing omission as action. *See generally Samantar v. Yousuf*, 560 U.S. 305, 320 n.13 (2010) (recognizing Congress to legislate against background of common law).[16] Thus, we are satisfied that

---

[16] Recognizing "use" by omission is no novel concept at law. Notably, the law has long recognized that a defendant can use deceit by omission to commit fraud. *See Neder v. United States*, 527 U.S. 1, 22 (1999) (stating that fraud's "well-settled meaning at common law" included material "misrepresentation or *omission*" (emphasis added) (internal quotation marks omitted)). Indeed, the principle is famously codified in securities law. *See* 15 U.S.C. § 78j(b) (criminalizing "use or employ[ment]" of "any manipulative or deceptive device or contrivance" in connection with purchase or sale of certain securities); *United States v. Gramins*, 939 F.3d 429, 444 (2d Cir. 2019) (recognizing securities fraud under § 78j(b) can be committed by "material omission if the defendant had a duty to speak" (internal quotation marks omitted)).

Congress intended for crimes intentionally causing at least serious physical injury—crimes necessarily involving a use of force—to be recognized as categorically violent whether committed by acts of omission or by acts of commission.[17]

This conclusion does not stretch the word "use" beyond its ordinary meaning when applied to violent force. Nor does it recognize a use of violent force in circumstances having little to do with the intended purpose of such force, *i.e.*, as an instrument for causing physical injury.[18] A defendant intent on causing serious physical injury can employ, utilize, make use of, or avail himself of violent force whether he initiates that force by his own physical act or breaches a legal duty to check or redress force already in motion. Likewise, he can convert violent force to his own injurious purpose, or derive service from such force, whether he acts by commission or omission. In the latter circumstance, a defendant's performance of his legal duty would presumably have prevented the violent force from having injurious effect. *See* 1 LaFave § 6.2(d), at 606–07 (recognizing that homicide-by-omission requires "'but for' causation: but for the

---

[17] To the extent our concurring colleague reaches the same conclusion by assigning "use of physical force" a specialized, rather than ordinary, meaning, there may not be much difference in our reasoning at least insofar as his construction derives from the specialized meaning of omission. *See* Menashi, *J.*, Concurring Op., *post* at 3–9. The specialized meaning of omission is longstanding and, in New York, codified, thereby affording notice to those who might be inclined to violate the law that breaching a legal duty is a culpable action.

[18] Dissenting in *Smith v. United States*, Justice Scalia expressed concern that the majority, in recognizing the exchange of a gun for drugs as a "use[ of] a firearm," departed too far from a firearm's ordinary intended purpose as a weapon. 508 U.S. at 242–43 (Scalia, *J.*, dissenting). Even that minority view is not a concern here because, whether first-degree manslaughter is committed by omission or commission, the defendant is using violent force against another person for its ordinary purpose, *i.e.*, to cause physical injury.

omission the victim would not have died"). Thus, it was by breaching that duty that the defendant was able to make use of the unchecked force, to avail himself of it, to derive service from it in carrying out his own injurious purpose. Such a breach of duty may require no *physical* action by a defendant, but it is *culpable* action in the eyes of the law. Specifically, such an omission is the action that causes death by the use of violent force. And so, whether committed by omission or commission, first-degree manslaughter is a categorically violent crime because its elements necessarily require a defendant's knowing and intentional use of the violent force that produces death.

### 2. *Castleman* Compels the Conclusion that First-Degree Manslaughter Necessarily Involves the Use of Violent Force

This conclusion is compelled, moreover, by *United States v. Castleman*. In that case, the Supreme Court stated that the "knowing or intentional causation of bodily injury *necessarily* involves the use of physical force." 572 U.S. at 169 (emphasis added).

At issue in *Castleman* was whether a Tennessee domestic assault statute proscribing the knowing or intentional causation of bodily injury "has, as an element, the use or attempted use of physical force," so as to make the offense a "misdemeanor crime of domestic violence" under 18 U.S.C. § 921(a)(33)(A). *See id.* § 922(g)(9) (federally prohibiting firearm possession by person with conviction for such misdemeanor crime). The district court concluded that the state law did not have a force element because a person could "cause bodily injury without violent contact—for example, by deceiving the victim into drinking a poisoned beverage." *United States v. Castleman*, 572 U.S. at 161–62 (brackets and internal quotation marks omitted). The Sixth Circuit agreed, but for a different reason: the state law

proscribed the causation of even "slight, nonserious physical injury," which could be accomplished with something less than "physical force" as construed in *Curtis Johnson v. United States*, 559 U.S. at 140. *United States v. Castleman*, 572 U.S. at 162 (internal quotation marks omitted). Reversing, the Supreme Court ruled that the "physical force" required to identify a misdemeanor crime of domestic violence under § 921(a)(33)(A) is simply common law force, *i.e.*, "offensive touching," *id.* at 162–163, not "force capable of causing physical pain or injury to another person," *Curtis Johnson v. United States*, 559 U.S. at 140, as is required to identify a "violent felony" under ACCA. *United States v. Castleman*, 572 U.S. at 162–68.

But further, and more important to our analysis here, the Supreme Court made clear in *Castleman* that where "use" is being construed in relationship to "physical force," a defendant's use of such force does not depend on *his* having forceful contact—or indeed any physical contact—with his injured victim. Rather, what matters is that the defendant must have knowingly and intentionally caused an injury that can result only from the use of physical force. On that point, the Court stated, without qualification: "[T]he knowing or intentional causation of bodily injury *necessarily* involves the use of physical force." *Id.* at 169 (emphasis added); *accord id.* at 174 (Scalia, J., concurring in part and concurring in judgment) (observing, even with respect to violent force, that "it is impossible to cause bodily injury without using force capable of producing that result" (internal quotation marks omitted)). Indeed, in rejecting an argument that a poisoner could kill his victim without using physical force by the non-violent act of surreptitiously sprinkling poison in the victim's drink, the Court explained that not only is the minimal *degree* of action necessary to sprinkle poison irrelevant to identifying a use of force, but also irrelevant is the very *act* of sprinkling. *See id.* at 171. The

28

Court stated that the "use of force" in the poisoning scenario "is not the act of sprinkling the poison" at all; rather, "it is the act of *employing* poison knowingly as a device to cause physical harm." *Id.* (emphasis added) (brackets and internal quotation marks omitted).[19]

Thus, *Castleman* rejected the argument here urged by Scott: that "use of force" requires some physical act by a defendant to initiate or apply the force. Rather, the Supreme Court there identified "use of physical force" by reference to two factors, one pertaining to causation and the other to *mens rea*.

First, the relevant physical force is that which *causes* physical injury to a victim, not that which is physically performed by a defendant. Several courts of appeals, including our own, have been quick to recognize the significance of causation in identifying a use of physical force. When, in *Villanueva v. United States*, we recognized Connecticut first-degree assault to be a categorical violent crime under ACCA, we stated that, following *Castleman*, "the inquiry as to 'force,' for federal law purposes, focuses on the causation of a consequence, rather than the physical act of initiating an action that leads to a consequence," 893 F.3d at 128; *see also United States v. Báez-Martínez*, 950 F.3d 119, 132 (1st Cir. 2020) (characterizing *Castleman* as deeming "injury to be the fingerprint of force").[20]

---

[19] This comports with the ordinary meaning of "use," which requires only that one "employ" or "make use" of the specified object—here, the violent force exerted by poison—to "carry out a purpose . . . by means [there] of"—that purpose here being intended physical injury. *Smith v. United States*, 508 U.S. at 228–29.

[20] This leaves no role for any contrary view expressed in *Chrzanoski v. Ashcroft*, 327 F.3d at 195. *Castleman*'s abrogation of that case, *see Villanueva v. United States*, 893 F.3d at 130, is complete.

Second, it is a defendant's *knowing* employment of violent force as a device to cause intended physical harm that establishes his "use." In other words, a defendant's "use" of violent force depends on his knowing or intentional causation of bodily injury, not on his own physical movements.

Because the only "consequence" for a victim of New York first-degree manslaughter is death (the ultimate physical injury), *Villanueva v. United States*, 893 F.3d at 128, and because the causation of that consequence "necessarily involves the use of physical force," *United States v. Castleman*, 572 U.S. at 169, a defendant convicted of that homicide crime because he intended to cause at least serious physical injury must be said to have knowingly used the force causing death regardless of whether he did so by commission or omission.

Of course, a defendant can—and frequently will—manifest a knowing employment of injurious violent force through his own physical acts, for example, when he intentionally fires a gun directly into someone's head or repeatedly stabs a victim (as Scott did when he twice committed first-degree manslaughter). But a defendant can also manifest a knowing employment of violent force by acts of omission, as when he breaches a legal duty to check or redress violent physical force *because* he specifically intends thereby to have that force cause serious physical injury. In that circumstance—satisfying the two elements of first-degree manslaughter—omission is how the defendant knowingly *avails* himself of the violent force that results in death. Omission is how he *employs* such force as the means to pursue his own injurious purpose. It is how he knowingly makes that force *his chosen instrument* for causing harm. That is the essence of "use" as explained in *Castleman*: "the word 'use' conveys the idea that the thing used (here, physical force) has been made the user's

30

instrument." *Id.* at 170–71 (internal quotation marks omitted); *see supra* at 22–24 (discussing ordinary meaning of "use"). Indeed, this court has already effectively recognized that crimes committed by omission can be categorically violent. *See United States v. Hill*, 890 F.3d at 58–59 (rejecting argument that threatening to withhold vital medicine would not threaten use of physical force). And, as we noted at the outset, six of seven courts of appeals to have considered the question agree. *See supra* note 5.[21]

Thus, following the reasoning of *Castleman*, our own decisions in *Villanueva* and *Hill,* and those of other courts of appeals, we hold that New York first-degree manslaughter is a categorically violent crime under the force clauses of ACCA and the Career Offender Guideline because—whether a defendant acts by commission or omission—the offense's causation and intent elements can be satisfied only when a defendant knowingly employs the violent force causing death as the instrument for pursuing his own seriously injurious purpose.

---

[21] We call particular attention to *United States v. Rumley*, wherein the Fourth Circuit states that under *Castleman*'s reasoning, "there is just as much a 'use of force' when a murderous parent uses the body's need for food to intentionally cause his child's death as when that parent uses the forceful physical properties of poison to achieve the same result." 952 F.3d at 551. Similarly, in *United States v. Sanchez*, the Eleventh Circuit, in holding New York second-degree murder to satisfy ACCA's force clause, stated that "the intentional causation of bodily injury or death, even by indirect means such as withholding medical treatment or food, necessarily involves the use of physical force." 940 F.3d at 535. In *United States v. Peeples*, the Eighth Circuit also recognized that when a caregiver refuses to feed a dependent, "it is the act of withholding food with the intent to cause the dependent to starve to death that constitutes the use of force." 879 F.3d at 287. The Supreme Court denied *certiorari* in both *Sanchez v. United States*, *see* 140 S. Ct. 559 (2019), and *Peeples v. United States*, *see* 138 S. Ct. 2640 (2018).

## C.   Scott's Contrary Arguments Do Not Persuade

In urging otherwise, Scott and/or his *amici* argue that *Castleman* is cabined by its context, which did not specifically consider the ACCA force clause or crimes that can be committed by omission. They insist that some physical act by a defendant is necessary to identify a use of force. These arguments fail to persuade.

### 1.   *Castleman*'s Reasoning Applies to the ACCA and Career Offender Guideline Force Clauses

As this court has already recognized, the link *Castleman* forged between the "intentional causation of bodily injury" and the "necessar[y] . . . use of physical force," 572 U.S. at 169, is both "independent" of the case's domestic relations context and "precisely relevant" to ACCA. *Villanueva v. United States*, 893 F.3d at 129 (collecting cases also applying *Castleman*'s reasoning to interpretation of other statutes).[22]  Indeed, it would make no sense to conclude that the lesser injury required for a misdemeanor crime of violence *necessarily* involves the use of physical force (even if only common law force) while the greater injury required for a violent felony can be caused without the use of any force at all. On this point, five of six courts of appeals to have considered the question agree.[23]  Scott

---

[22] To the extent our colleague, Judge Pooler, who dissented in *Villanueva*, 893 F.3d at 132–39 (Pooler, *J.,* dissenting), continues to challenge or seeks to cabin *Villanueva*'s holding, *see* Pooler, J., Dissenting Op., *post* at 9–11, we reject those efforts.

[23] *See United States v. Rumley*, 952 F.3d at 550–51 [4th Cir.] (applying *Castleman*'s reasoning to ACCA); *United States v. Báez-Martínez*, 950 F.3d at 130–33 [1st Cir.] (same); *United States v. Sanchez*, 940 F.3d at 535–36 [11th Cir.] (same); *United States v. Ontiveros*, 875 F.3d at 537–38 [10th Cir.] (same); *United States v. Jennings*, 860 F.3d 450, 459 (7th Cir. 2017) (same); *cf. United States v. Peeples*, 879 F.3d at 287 [8th Cir.] (applying *Castleman*'s reasoning to find Iowa attempted murder crime of violence under U.S.S.G. § 2K2.1(a)(4)). *But see United States v. Mayo*, 901 F.3d at 228, 229

provides no persuasive reason for us to depart from this view now as to either the ACCA or Career Offender Guideline force clause.

## 2. *Castleman*'s Reasoning Applies to Crimes Committed by Omission

The fact that neither *Castleman* nor *Villanueva* specifically addressed crimes that can be committed by omission does not mean that the reasoning in those cases about causation and use of force is inapplicable to such crimes.[24]  In so urging, Scott and his *amici* maintain that omission is "inaction," which, under Supreme Court precedent, cannot constitute use of force.  Appellee Br. at 14–17; Br. for Def. Orgs. as *Amici Curiae* at 11–16.  As signaled earlier, we reject both the premise and the conclusion.  *See supra* at 24–27.

### a. The Law Equates Omission with Action

An "omission" is a failure to act, but it is not a failure to act *simpliciter*.  Rather, it is the failure to act when the law imposes a duty to act.  Far from identifying such a breach of duty as *inaction*, the law views it as *action* sufficient to support criminal culpability.

---

n.15 [3d Cir.] (declining to extend *Castleman* to ACCA context, although recognizing this court to have done so in *Villanueva* based on *Castleman*'s focus on causation); *supra* note 5 (discussing Third Circuit's *en banc* review of issues in *Mayo*).

[24] We need not here decide if the crimes at issue in *Castleman*, *see* Tenn. Code Ann. § 39-13-111(b) (proscribing assault—defined in relevant part as "[i]ntentionally[ or] knowingly . . . caus[ing] bodily injury to another," *id.* § 39-13-101(a)(1)—against a "domestic abuse victim"), and *Villanueva*, *see* Conn. Gen. Stat. § 53a-59(a)(1) (proscribing intentional causation of "serious physical injury to another person . . . by means of a deadly weapon or a dangerous instrument"), can ever be committed by omission because even a negative answer makes no difference to our analysis.

To explain, the law always requires some "act" by a defendant to commit a crime. That is because our system of justice does not punish a person merely for "[b]ad thoughts." 1 LaFave §§ 6.1, 6.1(b), at 568, 570–71. But the "act" required by law is not dependent on a defendant's physical movements. Rather, the law recognizes that a person can also "act" to commit a crime by failing to perform a legal duty. *See id.* §§ 6.1(a)–(e), 6.2; *see also* 1 Charles E. Torcia, *Wharton's Criminal Law* § 25, at 139 (15th ed. 1993) (stating that, to be criminally liable, defendant must engage in "conduct," which "means an act or omission"). Such an "act of omission," sometimes referred to as a "negative act," *Act*, *Black's Law Dictionary* (11th ed. 2019), cannot, then, be dismissed as "inaction" or "literally no conduct," as Scott urges, Appellee Br. at 14. Much less can an omission be characterized as "not involv[ing] an act of any kind," *United States v. Scott*, 2017 WL 2414796, at *2, or "no action at all," Pooler, *J.*, Dissenting Op., *post* at 1. To the contrary, in the eyes of the law, a "failure to act where there is a duty to act is the equivalent of *affirmative action*" for purposes of identifying criminal culpability. 2 LaFave § 15.4(b), at 717 (emphasis added). *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012) (explaining need to consider "specialized meaning" that law may give to certain words, *e.g.*, "presumption that *person* in legal instruments denotes a corporation and other entity, not just a human being" (emphasis in original)).

That equivalency, originally rooted in common law, *see* 1 LaFave § 6.1(b), at 571 (observing "common law crimes all require an act or omission in addition to a bad state of mind"), is now reflected in the Model Penal Code, *see id.* § 2.01(1) (stating that "person is not guilty of an offense unless his liability is based on conduct that includes a voluntary act or . . . omission"), and the enacted laws of

most states.[25]   Thus, as relevant here, New York's Penal Law states that, "'[t]o act' means either to perform an act or to omit to perform an act."  N.Y. Penal Law § 15.00(5).  With respect to the former, New York defines a "[v]oluntary act" as "a bodily movement performed consciously as a result of effort or determination."  *Id.* § 15.00(2).  With respect to the latter, New York defines "omission" as "a failure to perform an act as to which a duty of performance is imposed by law." *Id.* § 15.00(3).  But for purposes of satisfying the act requirement for criminal culpability, New York equates the two:   "The minimal requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which he is physically capable of performing."  *Id.* at § 15.10.

In construing ACCA's force clause, we are mindful that its purpose is to define a "violent felony" by reference to the elements of such a crime.  *See Curtis Johnson v. United States*, 559 U.S. at 140 (construing "physical force" in ACCA by reference to "context of a statutory definition of 'violent felony'" (emphasis omitted)); *Leocal v. Ashcroft*, 543 U.S. at 9 (emphasizing importance of context "when interpreting a statute that features as elastic a word as 'use'").  We

---

[25] *See* Ala. Code § 13A-2-1(3)–(5); Alaska Stat. Ann. § 11.81.900(b)(7); Ariz. Rev. Stat. Ann. § 13-105(6); Ark. Code Ann. § 5-2-201(2)–(4); Colo. Rev. Stat. Ann. § 18-1-501(2), (7); Del. Code Ann. tit. 11, §§ 233, 242; Haw. Rev. Stat. §§ 701-118, 702-203; 720 Ill. Comp. Stat. Ann. 5/2-2, 5/4-1; Ind. Code Ann. § 35-41-2-1(a); Iowa Code Ann. § 702.2; Kan. Stat. Ann. § 21-5111(a); Me. Rev. Stat. Ann. tit. 17-A, §§ 2(2)–(3), 103-B; Mich. Comp. Laws Ann. §§ 750.5, 750.10; Mo. Ann. Stat. §§ 556.061(49)(b), 565.002(3); Mont. Code Ann. §§ 45-2-101(1), 45-2-202; Neb. Rev. Stat. Ann. § 28-109(5), (14); N.H. Rev. Stat. Ann. §§ 625:11(I), 626:1(I); N.J. Stat. Ann. §§ 2C:1-14(c)–(e), 2C:2-1; N.Y. Penal Law §§ 15.00, 15.10; N.D. Cent. Code Ann. §§ 12.1-01-04(2)–(3), 12.1-02-01; Ohio Rev. Code Ann. § 2901.21(A)(1); Or. Rev. Stat. Ann. § 161.085(3)–(5), (22); 18 Pa. Stat. and Cons. Stat. Ann. §§ 103, 301(a)–(b); Tex. Penal Code Ann. §§ 1.07(a)(10), (34), 6.01(a),(c); Utah Code Ann. § 76-1-601(5), (10); Wash. Rev. Code Ann. § 9A.04.110(1), (14).

assume that when Congress amended ACCA to add the force clause,[26] it was aware of these background principles recognizing that the elements of a crime—including the causation elements of crimes such as murder and manslaughter—can be satisfied by acts of omission as well as acts of commission. *See Samantar v. Yousuf*, 560 U.S. at 320 n.13 (stating "Congress is understood to legislate against a background of common-law . . . principles" (internal quotation marks omitted)); *Stokeling v. United States*, 139 S. Ct. 544, 551 (2019) (citing *Samantar* and construing ordinary meaning of "physical force" in ACCA to encompass force required to commit common law robbery); *see also* 1 LaFave § 6.2, at 588–90 (identifying murder and manslaughter as crimes defined in terms of cause and effect that can, in appropriate circumstances, be committed by omission).[27] Further, we assume that the Supreme Court possessed this same awareness when, in *Castleman*, it stated that crime elements requiring the "intentional causation of bodily injury *necessarily* involve[] the use of physical force." *United States v. Castleman*, 572 U.S. at 169 (emphasis added). Thus, Scott cannot avoid *Castleman*'s application to his first-degree manslaughter convictions by characterizing omission as mere "inaction" or "literally no conduct" under the criminal law. Appellee Br. at 14.

To the extent Scott equates omission with inaction in order to argue that *Chambers v. United States*, 555 U.S. 122 (2009), rather than

---

[26] *See generally* Career Criminals Amendment Act of 1986, Pub. L. No. 99-570, § 1402, 100 Stat. 3207.

[27] *Cf. Neder v. United States*, 527 U.S. at 23 (applying "rule that Congress intends to incorporate the well-settled meaning of the common-law terms it uses . . . unless the statute otherwise dictates" in identifying materiality of misrepresentation or *omission* as element of federal mail, wire, and bank fraud statutes (internal quotation marks omitted)).

*Castleman*, controls this case, he misreads *Chambers*. At issue there was a defendant's prior state conviction for failing to report to a penal institution, which the Supreme Court decided was not a violent felony under either ACCA's force clause or its residual clause. *See id.* at 125, 127–28. It was in reaching the latter conclusion that the Court characterized the failure-to-report crime as a "form of inaction" posing no "serious potential risk of physical injury." *Id.* at 128. Indeed, the Court supported that conclusion by citing a Sentencing Commission Report indicating that, of 160 examined failure-to-report cases, "none at all involved violence." *Id.* at 129.

This case is not analogous. Not only is ACCA's now-invalidated residual clause not at issue here, but also, Scott acknowledges that death amounting to first-degree manslaughter *always* results from violence. *See* Tr. Nov. 6, 2020, at 57. Moreover, the crime here under consideration, first-degree manslaughter, is not a "form of inaction." *Chambers v. United States*, 555 U.S. at 128. To the contrary, the crime's *actus reus*, far from proscribing a defendant's failure to do something, such as failing to report to prison, proscribes his doing something, specifically, causing the death of another person. It may be possible for a defendant to cause death either by physical action or by omission, but, in either circumstance, the causation of that ultimate physical injury *necessarily* involves the use of violent force. That is the teaching of *Castleman*, and it is that decision, not *Chambers*, that controls here.

b.  **Precedent Does Not Require a Defendant's Performance of Some Physical Act to Identify His Use of Force**

Scott maintains that Supreme Court precedent requires a defendant's performance of at least some physical act to identify his

use of force. In support, he invokes (1) *Curtis Johnson*'s definition of physical force to mean "active power; vigor," *Curtis Johnson v. United States*, 559 U.S. at 139 (internal quotation marks omitted); (2) *Castleman*'s reference to "the *act* of employing" force, *United States v. Castleman*, 572 U.S. at 171 (emphasis added); (3) *Villanueva*'s recitation of this reference in *Castleman* as well as its mention of "*initiating*, however gently, a consequence," *Villanueva v. United States*, 893 F.3d at 129 (emphasis added); and (4) various references to the "active employment" of physical force in *Bailey v. United States*, 516 U.S. at 144, 150; *Voisine v. United States*, 136 S. Ct. at 2278–79; and *Leocal v. Ashcroft*, 543 U.S. at 9. When placed in their proper context, none of the quoted excerpts supports Scott's argument.

Scott's reliance on *Curtis Johnson* conflates "physical force" with the "use" of such force. *Curtis Johnson* holds only that the former term should be construed according to its "ordinary meaning," observing that dictionary definitions describe "force" as "active power; vigor," and "physical force" as "force consisting in a physical act." 559 U.S. at 138–39 (brackets and internal quotation marks omitted). The case says nothing about what constitutes a use of physical force. Certainly, it does not hold that use requires a physical act.[28]

It was subsequently, in *Castleman*, that the Supreme Court discussed what constitutes a "use" of physical force. The Court there explained that the relevant physical force is that which physically injures the victim. Whether a defendant can be said to have used that

---

[28] Our dissenting colleague repeats Scott's conflation error when she charges us with concluding that "*Johnson* says nothing about what constitutes force." Pooler, J., Dissenting Op., *post* at 6 n.3. As we emphasize in text, *Curtis Johnson* has much to say about the term "physical force." It has nothing to say about what constitutes a "use" of such force.

particular force depends not on his own performance of any particular physical act but, rather, on "the act of employing [physical force] knowingly as a device to cause physical harm." *United States v. Castleman*, 572 U.S. at 171. As we have already explained *supra* at 22–27, a defendant can knowingly employ force by omission as well as by commission. The Court's use of the phrase "act of employing" does not signal otherwise, because, as we have also already explained *supra* at 33–35, an omission is as much an "act" under the criminal law as a person's voluntary physical movements. *See* N.Y. Penal Law § 15.00(5).[29]

---

[29] Scott submits that Justice Scalia, concurring in *Castleman*, identified "acts of omission" as "nonphysical conduct" that "cannot possibly be relevant to the meaning of a statute requiring 'physical force.'" *United States v. Castleman*, 572 U.S. at 181 (Scalia, *J.*, concurring in part and concurring in judgment) (emphasis omitted). He quotes this language out of context. The language is found in the part of the concurring opinion rejecting the majority's construction of "physical force" as used in 18 U.S.C. § 921(a)(33)(A) to mean common law force rather than violent force. It was in that context that Justice Scalia faulted the majority's reliance on an *amicus* brief, which proposed defining domestic violence to include "such a wide range of nonviolent and even *nonphysical* conduct that . . . cannot possibly be relevant to the meaning of a statute requiring 'physical force,' or to the legal meaning of 'domestic violence.'" *Id.* (emphasis in original). He explained that the urged range of conduct included "acts that 'humiliate, isolate, frighten, . . . [and] blame . . . someone'; 'acts of omission'; 'excessive monitoring of a woman's behavior, repeated accusations of infidelity, and controlling with whom she has contact.'" *Id.* (quoting Br. for National Network to End Domestic Violence et al., as *Amici Curiae*, 5–8, & nn.7, 11 (quoting UNICEF, *Domestic Violence Against Women and Girls*, Innocenti Digest, June 2000, at 2)). The "acts of omission" identified in the UNICEF report relied on by the *amicus* brief were "[g]ender bias that discriminates in terms of nutrition, education and access to health care." UNICEF, *Domestic Violence Against Women and Girls*, Innocenti Digest, June 2000, at 2. This is not what the criminal law generally, or New York law in particular, means by a culpable omission. *See supra* at 33–35. Thus, we have no reason to think that Justice Scalia's quoted criticism pertained in any way to such omissions, much less that he was thereby qualifying his earlier pronouncement that "it is impossible to cause bodily injury without using force capable of producing that result." *United States v. Castleman*, 572 U.S. at 174 (Scalia, *J.*, concurring in part and concurring in

As for *Villanueva*'s reference to "*initiating*, however gently, a consequence," 893 F.3d at 129 (emphasis added), the statement is part of a sentence that, in its entirety, reads as follows: "The explanation [in *Castleman*] that initiating, however gently, a consequence that inflicts injury constitutes the use of physical force was independent of both the [case's] domestic relations context and the fact that the offense at issue was a misdemeanor." *Id.* Plainly, the point of the sentence was to emphasize that *Castleman*'s reasoning was not cabined by the case's context; it was not to identify a physical-act requirement for the use of force. That conclusion is reinforced by a preceding sentence. *See id.* at 128 (observing that in *Castleman*, Supreme Court made "clear" that a use-of-force inquiry "focuses on the causation of a consequence, *rather than the physical act of initiating an action that leads to a consequence*" (emphasis added)). A subsequent sentence makes the same point. *See id.* at 129 (observing that "relevant force is the impact of the [injurious] substance on the victim, *not the impact of the user on the substance*" (emphasis added)).[30]

No different conclusion can be drawn from cases construing "use" as "*active* employment." In *Bailey v. United States*, the Supreme Court used that formulation in discussing the use or carrying of a firearm proscribed by an earlier version of 18 U.S.C. § 924(c)(1). *See* 516 U.S. at 148–50. The Court there observed that the ordinary meaning of the word "use" implied "action and implementation,"

---

judgment) (internal quotation marks omitted). Rather, we assume that statement applies to first-degree manslaughter, whether a defendant acts by commission or omission.

[30] While our dissenting colleague faults the *en banc* court for "shifting the focus of '[use of ]force' from the defendant's conduct to the victim's injury," Pooler, *J.*, Dissenting Op., *post* at 11, in fact, we simply follow *Castleman* as already correctly construed by this court in *Villanueva*.

which, in the context of § 924(c), connoted activity beyond mere possession of a gun. *Id.* at 145. The Court explained that reading "use" to reach possession, even to protect drugs or to embolden the defendant, would leave "no role . . . for 'carry'" in the statute. *Id.* It stressed, however, that "use" did encompass a defendant who "has a gun on display during a [drug] transaction." *Id.* at 146.

This case is not akin to *Bailey*, and those differences are important to understanding what constitutes "active employment" in each context. *See id.* at 145 (acknowledging that construction of word "use" depends on "its placement and purpose in [a] statutory scheme"). First, the object of required use in *Bailey* was a gun, a specific, tangible object. The object of required use here is violent physical force, intangible power evident in myriad forms, some obvious, others insidious. Second, while a gun can be used to unleash violent force, an unused gun can be inert. By contrast, the very essence of violent force is power in physical motion, specifically, power that, once unleashed or unchecked, is capable of causing physical pain or injury. Third, and perhaps most important, serious physical injury can, but need not, involve the use of a gun. But, as *Castleman* and *Villanueva* recognize, serious physical injury *necessarily* involves the use of violent force. Thus, a defendant's use of a gun may only be evident from particular activities, *see id.* at 148 (identifying activities amounting to use of firearm), whereas a defendant's use of violent physical force is always evident from his knowing causation of serious bodily injury, *see United States v. Castleman*, 572 U.S. at 169–70; *Villanueva v. United States*, 893 F.3d at 128–29. It does not matter whether such causation results from a defendant's physical acts in instigating or applying violent force or from his acts of omission in failing to check or redress violent force already in motion. In both circumstances, the defendant's actions

allow him to employ violent force as his instrument for causing intended physical injury.  This constitutes an "active employment" of violent force.[31]

*Voisine v. United States* and *Leocal v. Ashcroft* are not to the contrary.  In both cases, the Supreme Court referenced a defendant's "active employment" of physical force to emphasize that the use of physical force causing bodily injury must be more than accidental or negligent, not that it must involve the defendant's physical movement.  Thus, in *Leocal*, which construed the force clause defining violent crimes in 18 U.S.C. § 16(a),[32] the Court stated:

---

[31] After oral argument, Scott submitted that the recent decision in *Gray v. United States*, 980 F.3d 264 (2d Cir. 2020), supports the conclusion that "inaction" is not a "use of physical force against the person of another."  Scott 28(j) Letter (quoting 18 U.S.C. § 924(e)(2)(B)(i)).  He is mistaken.  *Gray* holds that 18 U.S.C. § 111(b)—which proscribes forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with certain federal employees while (1) "us[ing] a deadly or dangerous weapon," or (2) "inflict[ing] bodily injury"—is categorically a crime of violence under § 924(c)'s force clause.  *Gray v. United States*, 980 F.3d at 266.  In so ruling, the Court observed that the word "inflict" in § 111(b) necessarily implicates physical force because it requires "physical, not proximate, causation," which involves "applying force directly" or being "the direct physical cause of the injury."  *Id.* at 267 (brackets and internal quotation marks omitted).  That infliction of bodily injury thus easily satisfies ACCA's force clause does not transform its noted features into the minimum requirement for the use of force.  First-degree manslaughter does not demand that a defendant "inflict" injury.  Rather, it proscribes the causation of death by a defendant intent on causing at least serious physical injury.  In those circumstances, *Gray* warrants no departure from *Castleman*'s instruction that the intentional causation of bodily injury necessarily involves the use of physical force.

[32] Section 16(a) differs from ACCA in that its force clause defines a "crime of violence" as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person *or property* of another."  18 U.S.C. § 16(a) (emphasis added).

> While one may, in theory, actively employ something in an accidental manner, it is much less natural to say that a person actively employs physical force against another person by accident. Thus, a person would "use . . . physical force against" another when pushing him; however, we would not ordinarily say a person "use[s] . . . physical force against" another by stumbling and falling into him. . . . The . . . phrase . . . "use . . . of physical force against the person . . . of another"—most naturally suggests a higher degree of intent than negligent or merely accidental conduct.

543 U.S. at 9 (emphasis omitted) (holding Florida driving-under-the-influence-and-causing-injury crime did not satisfy force clause because offense lacked requisite *mens rea* element and, thus, injury could result from negligence or accident). Similarly, in *Voisine*, construing the force clause defining misdemeanor crimes of domestic violence under 18 U.S.C. § 922(g)(9)—the force clause at issue in *Castleman*, *see supra* at 27—the Court reiterated that "an involuntary motion, even a powerful one, is not naturally described as an active employment of force." *Voisine v. United States*, 136 S. Ct. at 2279 (holding Maine domestic assault satisfied force clause of 18 U.S.C. § 921(a)(33)(A) because offense's *mens rea* element required at least recklessness, which sufficed to indicate that harm caused resulted from "deliberate decision").

The crime here at issue, first-degree manslaughter, raises no such concerns. Under New York law, there is no possibility of committing first-degree manslaughter accidentally, negligently, or even recklessly.[33] Rather, the crime demands more: a defendant must

---

[33] Whether reckless felonies satisfy ACCA's force clause is a question presently pending before the Supreme Court. *See Borden v. United States*, No. 19-5410 (appeal argued Nov. 3, 2020).

cause death while specifically intending to cause at least serious physical injury to another person.  Under the reasoning in *Leocal*, *Voisine*, and *Castleman*, such a defendant "actively employs" physical force in committing the crime.[34]

### c.  There Is No Need to Resort to the Rule of Lenity

Scott argues that if the ACCA and Career Offender Guideline force clauses do not clearly require a defendant's performance of a physical act to identify a *use* of force, they are at least ambiguous on the point, in which case the rule of lenity requires the court to resolve that ambiguity in his favor.  *See United States v. Santos*, 553 U.S. 507, 514 (2008) (stating that "rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them").

Scott's invocation of the rule is not without some irony.  There can be no question that he performed physical acts in shooting and stabbing his two manslaughter victims.  *See supra* at 10.  Thus, to the extent the lenity rule is grounded in a concern for "fair warning," *see McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, *J.*); *United*

---

[34] Thus, to the extent *Leocal and Voisine* might support our dissenting colleague's assertion that ACCA "does not seek to include all criminal acts resulting in injury or fatality," Pooler, *J.*, Dissenting Op., *post* at 20, the determinative factor is not a defendant's physical actions, but rather, his *mens rea*, *see supra* at 21–24.  Nor can the dissent rely on *Lofton v. United States*, 920 F.3d 572 (8th Cir. 2019), to urge otherwise.  *See* Pooler, *J.*, Dissenting Op., *post* at 20–21.  The reason the state sexual abuse statute there at issue did not qualify as a crime of violence was not that it lacked a physical act requirement for use of force but, rather, that it did not require the involvement of any force at all.  *See Lofton v. United States*, 920 F.3d at 576 ("Notably absent [from the statute] is any requirement of force . . . ." (internal quotation marks omitted)).  As Scott acknowledges, a death qualifying as first-degree manslaughter always results from violent physical force.  *See* Tr. Nov. 6, 2020, at 57.  And a defendant who causes that death is guilty of first-degree manslaughter only if his intent was to cause at least serious physical injury.

*States v. Bass*, 404 U.S. 336, 347–48 (1971), Scott can hardly claim that *he* was not clearly warned that his manslaughter convictions exposed him to enhanced penalties under ACCA and the Career Offender Guideline for any subsequent possession of a firearm. *See generally United States v. Fields*, 113 F.3d 313, 325 (2d Cir. 1997) (holding that even if statutory sentencing enhancement was ambiguous on its face as to "cocaine base," defendants could not benefit from rule of lenity where term clearly applied to their dealing in crack cocaine).

But even assuming *arguendo* that, in the context of a categorical inquiry, lenity may be invoked by a defendant who received fair warning, Scott's argument is defeated by *Castleman*'s clear pronouncement that a defendant "necessarily" uses physical force in committing a crime involving the intentional causation of physical injury. *See supra* at 27–31. Indeed, in so ruling, the Supreme Court specifically rejected defendant Castleman's invocation of the rule of lenity to urge a narrow construction of § 921(a)(33)(A)'s force clause. *See United States v. Castleman*, 572 U.S. at 172–73. The Court reiterated that the rule is the last canon of construction, applicable only if, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Id.* at 172–73 (internal quotation marks omitted); *see Shular v. United States*, 140 S. Ct. 779, 787 (2020) (stating that rule of lenity applies "only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute" (internal quotation marks omitted)). That is not this case.

The ACCA and Career Offender Guideline force clauses state that a "violent felony" or a "crime of violence" must have as an element the use of physical force. They say nothing about that use

45

requiring a defendant's own performance of a physical act. Indeed, such a requirement would be curious rather than expected given the law's recognition that a crime's elements, including the causation elements of homicide crimes such as murder and first-degree manslaughter, can be satisfied by omission. As we have already discussed, an omission, *i.e.*, the breach of a legal duty to act, is an "action" sufficient to support criminal culpability, even if it does not involve any physical movement by a defendant. *See supra* at 33–36.

Nor does the word "use" support a physical act requirement. As discussed, the common meaning of the word is "to make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of[;] . . . or to derive service from." *Smith v. United States*, 508 U.S. at 229 (brackets and internal quotation marks omitted). Every one of these definitions easily applies to first-degree manslaughter committed by omission. *See supra* at 22–27.

Legislative history and purpose also do not support construing the force clauses of ACCA and the Career Offender Guideline to exclude crimes that can be committed by omission from the sphere of categorically violent felonies. When Congress added a force clause to ACCA, it specifically identified "murder, rape, assault, [and] robbery" as among the crimes "involving physical force" that it expected to qualify as categorical violent felonies. H.R. Rep. No. 99-849, at 3 (1986); *see also Curtis Johnson v. United States*, 559 U.S. at 140–41 (favorably citing dictionary definition of "'violent felony' as '[a] crime characterized by extreme physical force, such as murder, forcible rape, and assault and battery with a dangerous weapon'"). As we noted *supra* at 4, note 1, 7, first-degree manslaughter differs from murder only in that the former requires a defendant's intent to

46

cause serious physical injury while the latter requires his intent to kill. But both crimes require a defendant to cause death. And if, because death can be caused by omission, first-degree manslaughter is not a categorically violent crime, it would follow that neither is murder. That conclusion, and the reasoning supporting it, are so far removed from Congress's purpose in amending ACCA as to preclude finding it plausible that first-degree manslaughter committed by omission cannot be categorically violent.[35]

Reinforcing our conclusion that Scott does not offer a plausible alternative construction of the ACCA and Career Offender force clauses are the disquieting outcomes of his hypothetical applications.[36] Acknowledging, as he must, that a defendant can use

---

[35] Our dissenting colleague, Judge Leval, states that while he would not apply the rule of lenity to the Career Offender Guideline's force clause, he would apply the canon to ACCA's identically-phrased force clause because ACCA's penalty is mandatory while the Guideline enhancement is not. *See* Leval, *J.*, Dissenting Op., *post* at 10–12. Even if some of us might share Judge Leval's disquiet about mandatory minimum sentences and his preference for broad judicial sentencing discretion, our task here is to identify unresolvable statutory ambiguity, not to tilt the balance in favor of judicial sentencing discretion. In short, we resort to lenity only to resolve "grievous[]" ambiguities as to Congress's intent after all other tools of construction have been exhausted. *United States v. Hayes*, 555 U.S. 415, 429 (2009) (stating that statutory definition may not be "a model of the careful drafter's art" and yet still not be so "grievously ambiguous" as to warrant rule of lenity (brackets and internal quotation marks omitted)). For the reasons just stated, we locate no such grievous ambiguity here.

[36] Just as a court will not construe a statute to yield absurd results contrary to Congress's purpose, *see Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705 (2d Cir. 2019) ("It is . . . well-established that [a] statute should be interpreted in a way that avoids absurd results." (internal quotation marks omitted)), it will not recognize genuine ambiguity where a party's urged alternative construction yields absurd results, *see Smith v. United States*, 508 U.S. at 239 ("The mere possibility of articulating a narrower construction . . . does not by itself make the rule of lenity applicable."); *cf. United States v. Valle*, 807 F.3d 508, 523 (2d Cir. 2015) (applying lenity where "the Government and the defense both posit *plausible* interpretations

force indirectly, *see United States v. Castleman*, 572 U.S. at 170–71; *Villanueva v. United States*, 893 F.3d at 130, but maintaining that even indirect use must involve some physical act, Scott submits that a parent who commits first-degree manslaughter by failing to rescue his drowning child would have used the violent force of water in the child's lungs if the parent had himself filled the swimming pool with water, but not if he had simply let rainwater do so. *See* Tr. Nov. 6, 2020, at 67–69. Further, Scott submits that a caregiver who commits first-degree manslaughter by starving a patient would have used the violent force of starvation on a body if he (falsely) told the person not to eat available food because it was poisoned, but not if he failed to put delivered food within the patient's reach. *See id.* at 73–77. Why the difference? Scott maintains it is because the first caregiver in each scenario engaged in physical action, whether by filling the pool or moving his lips, while the second caregiver in each scenario did nothing. *See id.*

The distinctions Scott draws are more than unconvincing; they are meaningless to identifying a "use of force." The parent intent on seriously injuring his child *employs* the violent force of pool water in the unrescued child's lungs as much when rainwater fills the pool as when the parent does so himself with a hose. A caregiver intent on injuring a dependent *avails* himself of starvation's violent effects on the body as much when he breaches a legal duty to make food accessible as when he tricks his victim into not eating accessible food. What matters to identifying the use of force in these hypothetical first-

of a criminal statute" (emphasis added)); *Securities & Exch. Comm'n v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) (rejecting contention that plaintiff's urged interpretation avoided absurdity, observing "that it is the [plaintiff's] interpretation that can lead to absurd results").

degree manslaughter situations is not whether the defendant engaged in a physical act in causing a victim's death. What matters is that, in each scenario, the defendant caused death while intending to cause at least serious physical injury. It is that "knowing or intentional causation of bodily injury [that] necessarily involves the use of physical force." *United States v. Castleman*, 572 U.S. at 169.[37]

Thus, we conclude that New York first-degree manslaughter is a categorically violent crime under both the ACCA and Career Offender Guideline force clauses because, whether a defendant acts by commission or omission, in every instance, it is his intentional use of physical force against the person of another that causes death.

## III. The Career Offender Guideline's Enumerated Offenses Clause

The government submits that, even if first-degree manslaughter does not qualify as a categorical violent crime under the ACCA and Career Offender Guideline force clauses, it is such a crime under the Guideline's enumerated offenses clause. *See* U.S.S.G. § 4B1.2(a)(2) (defining "crime of violence" as felony that "is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession" of certain firearms and explosive material). The Supreme

---

[37] While we have indulged these hypothetical homicide-by-omission scenarios, we note that none is to be found in any actual New York prosecution for first-degree manslaughter. Nor do our dissenting colleagues point to any New York case in fact applying the state's first-degree manslaughter statute to the "malicious guardian" and "assisted suicide" omission scenarios that they posit. *See* Leval, *J.*, Dissenting Op., *post* at 5–6; Pooler, *J.*, Dissenting Op., *post* at 12–15. We reiterate that a threshold requirement of any defendant's claim that a state crime is not categorically violent is a showing that the state actually prosecutes the crime in the non-violent scenario being hypothesized. *See United States v. Hill*, 890 F.3d at 56.

Court has explained that the enumerated offenses are to be given their "generic" meanings, *see Taylor v. United States*, 495 U.S. 575, 598 (1990), which we ascertain "[i]n many instances" by reference to "the sense in which the term is now used in the criminal codes of most States," but also by "consult[ing] other sources, including federal criminal statutes, the Model Penal Code, scholarly treatises, and legal dictionaries," *United States v. Castillo*, 896 F.3d 141, 150 (2d Cir. 2018) (internal quotation marks omitted).

The government contends that New York first-degree manslaughter is generic voluntary manslaughter because 28 states punish the conduct proscribed by N.Y. Penal Law § 125.20(1) as either murder (20 states[38]) or the lesser-included offense of voluntary manslaughter (8 states[39]). In any event, the government submits that

---

[38] The 20 states penalizing such conduct as murder do so under statutes proscribing either what Professor LaFave refers to as "intent-to-do-serious-bodily-injury" murder, 2 LaFave § 14.3, at 590; *see* Alaska Stat. Ann. § 11.41.110(a)(1); Ariz. Rev. Stat. Ann. § 13-1104(A)(2); Ark. Code Ann. § 5-10-103(a)(2); 720 Ill. Comp. Stat. Ann. 5/9-1(a)(1); La. Stat. Ann. § 14:30.1(1); *Thornton v. State*, 919 A.2d 678, 693 (Md. 2007); Mo. Ann. Stat. § 565.021(1); N.J. Stat. Ann. § 2C:11-3(1), (2); *Commonwealth v. Fisher*, 80 A.3d 1186, 1191–92 (Pa. 2013); Tex. Penal Code Ann. § 19.02(b)(1), (2); Utah Code Ann. § 76-5-203(2)(b); *State v. Congress*, 114 A.3d 1128, 1135 (Vt. 2014); *State v. Davis*, 648 S.E.2d 354, 358–59 (W. Va. 2007), or homicides predicated on intended assaults or batteries, *see* Ga. Code Ann. §§ 16-5-1(c), 16-5-24(a); Miss. Code Ann. §§ 97-3-19(1)(c), 97-3-7(2)(a); Mont. Code Ann. §§ 45-5-102(1)(b), 45-5-202(1); Ohio Rev. Code Ann. §§ 2903.02(B), 2903.11(A)(1); Okla. Stat. Ann. tit. 21, §§ 646(A)(1), 701.8(2); Wash. Rev. Code Ann. §§ 9A.32.050(1)(b), 9A.36.011; Wis. Stat. Ann. §§ 940.03, 940.19(5).

[39] *See* Conn. Gen. Stat. Ann. § 53a-55; Del. Code Ann. tit. 11, § 632(2); Ky. Rev. Stat. Ann. § 507.030(1)(a); *People v. Townes*, 218 N.W.2d 136, 140 (Mich. 1974); Minn. Stat. Ann. § 609.20(2); *State v. English*, 772 S.E.2d 740, 745 (N.C. Ct. App. 2015); N.Y. Penal Law § 125.20(1); *State v. Ortiz*, 824 A.2d 473, 486 (R.I. 2003).

a majority of states punish the conduct, at minimum, as aggravated assault.[40]

Scott responds that the states defining the conduct as murder and those defining it as voluntary manslaughter cannot be aggregated to establish a majority view. Further, he maintains that few states punish conduct that can be committed by omission as aggravated assault.

The original panel was sharply divided on this enumerated-offenses clause question.[41] The panel decision favoring Scott on this

---

[40] Aggravated assault generally punishes assaults or batteries where serious physical injury is caused intentionally, knowingly, or, in some cases, recklessly. *See* 2 LaFave § 16.2(d), at 764–65; Model Penal Code § 211.1(2)(a); *see also United States v. Delis*, 558 F.3d 177, 181 (2d Cir. 2009) (observing that "distinction between assault and battery . . . has been regularly elided" and the "two terms have often been used interchangeably"). Forty-four state laws proscribe assaults or batteries in such aggravated circumstances. *See* Ala. Code § 13A-6-21; Alaska Stat. Ann. § 11.41.200; Ariz. Rev. Stat. Ann. §§ 13-1203, 1204; Ark. Code Ann. § 5-13-202; Cal. Penal Code § 243(d); Colo. Rev. Stat. Ann. § 18-3-202; Conn. Gen. Stat. Ann. § 53a-60; Del. Code Ann. tit. 11, § 612; Fla. Stat. Ann. § 784.045; Ga. Code Ann. § 16-5-24; Haw. Rev. Stat. Ann. § 707-710; Idaho Code Ann. § 18-907; 720 Ill. Comp. Stat. Ann. 5/12-3.05; Ind. Code Ann. § 35-42-2-1(g); Kan. Stat. Ann. § 21-5413; Ky. Rev. Stat. Ann. § 508.020; La. Stat. Ann. § 14:34.1; Me. Rev. Stat. Ann. tit. 17-A, § 208; Md. Code Ann., Crim. Law § 3-202; Minn. Stat. Ann. § 609.221; Miss. Code Ann. § 97-3-7(2)(a); Mo. Ann. Stat. § 565.050; Mont. Code Ann. § 45-5-202(1); Neb. Rev. Stat. § 28-308; Nev. Rev. Stat. Ann. § 200.481(2)(b); N.H. Rev. Stat. Ann. § 631:1; N.J. Stat. Ann. § 2C:12-1; N.M. Stat. Ann. § 30-3-5; N.Y. Penal Law § 120.05; N.C. Gen. Stat. Ann. § 14-33(c); N.D. Cent. Code Ann. § 12.1-17-02; Ohio Rev. Code Ann. § 2903.11; Okla. Stat. Ann. tit. 21, § 646; Or. Rev. Stat. Ann. § 163.175; 18 Pa. Stat. and Cons. Stat. Ann. § 2702; 11 R.I. Gen. Laws Ann. § 11-5-2; S.D. Codified Laws § 22-18-1.1; Tenn. Code Ann. § 39-13-102; Tex. Penal Code Ann. § 22.02; Utah Code Ann. § 76-5-103; Vt. Stat. Ann. tit. 13, § 1024; Wash. Rev. Code Ann. § 9A.36.011; Wis. Stat. Ann. § 940.19; Wyo. Stat. Ann. § 6-2-502.

[41] *Compare United States v. Scott*, 954 F.3d at 89–92 (holding clause inapplicable), *with id.* at 105–09 (Raggi, *J.*, dissenting) (concluding that clause applied to first-degree manslaughter).

point is now vacated, and our dissenting colleague's efforts to defend it confer no weight. *See* Pooler, *J.*, Dissenting Op., *post* at 29–34. We need not ourselves decide the question because we hold Scott's first-degree manslaughter convictions to be for violent crimes under the ACCA and Career Offender Guideline force clauses. *See United States v. Tabb*, 949 F.3d 81, 83 n.3 (2d Cir. 2020) ("Because [New York] attempted assault in the second degree . . . qualifies as a crime of violence under the [Guideline's] Force Clause, we need not determine whether it would also meet the enumerated offenses clause definition of a crime of violence.").

In sum, because Scott stands convicted of at least three prior violent crimes under the ACCA and Career Offender Guideline force clauses, the district court erred in vacating his original sentence and in resentencing him without applying the ACCA mandatory minimum and Career Offender Guideline enhancement. We, therefore, vacate the reduced sentence reflected in the amended judgment, and we remand the case to the district court with directions that it reinstate the original sentence and judgment consistent with this opinion.

## CONCLUSION

To summarize, we conclude as follows:

(1) First-degree manslaughter in violation of New York Penal Law § 125.20(1) is categorically a "violent felony" under ACCA and a "crime of violence" under the Career Offender Guideline because the crime's elements require the "use . . . of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i); U.S.S.G. § 4B1.2(a)(1). Specifically, the elements require that a defendant (1) cause death while (2) intending to cause at least serious physical injury, and the

Supreme Court has stated that the "knowing or intentional causation of bodily injury necessarily involves the use of physical force," *United States v. Castleman*, 572 U.S. at 169; *accord Villanueva v. United States*, 893 F.3d at 128–29.

(2) The possibility of committing New York first-degree manslaughter by omission warrants no different conclusion because

(a) criminal law generally, and New York law specifically, recognize omission as "action" sufficient to support criminal culpability, *see* N.Y. Penal Law § 15.00(5);

(b) the ordinary meaning of "use" applies as much to a use of physical force by omission as by commission; and

(c) precedent holds that

(i) the relevant physical force for purposes of federal law is that which causes physical injury to the victim, not that which is physically performed by a defendant; and

(ii) it is a defendant's knowing or intentional causation of injury by means of that force, not a defendant's physical acts, that determines his use of force. *See United States v. Castleman*, 572 U.S. at 169; *Villanueva v. United States*, 893 F.3d at 128.

(3) The district court, therefore, erred in concluding that Scott's two convictions for New York first-degree manslaughter do not qualify as "violent felonies" under ACCA and "crimes of violence" under the Career Offender Guideline, and in vacating Scott's original sentence and resentencing him.

Accordingly, we **VACATE** the panel decision, **REVERSE** the district court's grant of Scott's § 2255 motion, **VACATE** the sentence reflected in the amended judgment, and **REMAND** the case to the district court with directions to reinstate Scott's original sentence and judgment.

PARK, *Circuit Judge*, joined by LIVINGSTON, *Chief Judge*, CABRANES, SULLIVAN, and NARDINI, *Circuit Judges*, concurring:

I join the majority's excellent opinion in full and write separately only to note the absurdity of the exercise we have now completed. The en banc court convened to decide whether Mr. Scott's two convictions for first-degree manslaughter—one for shooting a man in the face and the other for stabbing a man to death—count as "violent felonies" under ACCA (or as "crimes of violence" under the Guidelines). The question answers itself to any layperson with common sense. But judges tasked with applying the so-called "categorical approach" are required to ignore the actual facts before them and instead to theorize about whether certain crimes could be committed without using violent force. And so that is what we have done in this case.

As a growing number of judges across the country have explained, the categorical approach perverts the will of Congress, leads to inconsistent results, wastes judicial resources, and undermines confidence in the administration of justice. *See, e.g.,* *Mathis v. United States*, 136 S. Ct. 2243, 2258 (2016) (Kennedy, *J.,* concurring) ("[T]oday's decision is a stark illustration of the arbitrary and inequitable results produced by applying an elements based approach to this sentencing scheme."); *id.* at 2268–69 (Alito, *J.,* dissenting) ("The Court's approach calls for sentencing judges to delve into pointless abstract questions. . . . A real-world approach would avoid the mess that today's decision will produce."); *Lopez-Aguilar v. Barr*, 948 F.3d 1143, 1149 (9th Cir. 2020) (Graber, *J.,* concurring) ("I write separately to add my voice to the substantial chorus of federal judges pleading for the Supreme Court or Congress to rescue us from the morass of the categorical approach. The categorical approach requires us to perform absurd legal gymnastics,

and it produces absurd results." (citations omitted)); *United States v. Battle*, 927 F.3d 160, 163 n.2 (4th Cir. 2019) (Quattlebaum, *J.*) ("Through the *Alice in Wonderland* path known as the 'categorical approach,' we must consider whether Battle's assault of a person with the intent to murder is a crime of violence. While the answer to that question might seem to be obviously yes, it is not so simple after almost 30 years of jurisprudence beginning with *Taylor*."); *United States v. Escalante*, 933 F.3d 395, 406–07 (5th Cir. 2019) (Elrod, *J.*) ("In the nearly three decades since its inception, the categorical approach has developed a reputation for crushing common sense in any area of the law in which its tentacles find an inroad. . . . Perhaps one day the Supreme Court will consider revisiting the categorical approach and setting the federal judiciary down a doctrinal path that is easier to navigate and more likely to arrive at the jurisprudential destinations that a plain reading of our criminal statutes would suggest." (footnotes omitted)); *United States v. Burris*, 912 F.3d 386, 407 (6th Cir. 2019) (en banc) (Thapar, *J.*, concurring) ("A casual reader of today's decision might struggle to understand why we are even debating if ramming a vehicle into a police officer is a crime of violence. The reader's struggle would be understandable. The time has come to dispose of the long-baffling categorical approach."); *United States v. Douglas*, 907 F.3d 1, 14 (1st Cir. 2018) (Lynch, *J.*) ("On the whole, it is at least as practical to allow a jury to parse carefully between crimes based on specific real-world conduct rather than, under a categorical approach, to force judges to be willfully blind to particular facts and thus to go down the rabbit hole to a realm where we must close our eyes as judges to what we know as men and women." (cleaned up)); *United States v. Williams*, 898 F.3d 323, 337 (3d Cir. 2018) (Roth, *J.*, concurring) ("I write separately because of my concern that the categorical approach, along with its offspring, the modified

2

categorical approach, is pushing us into a catechism of inquiry that renders these approaches ludicrous."); *Cradler v. United States*, 891 F.3d 659, 672 (6th Cir. 2018) (Kethledge, *J.*, concurring) ("Whatever the merits of [the categorical] approach, accuracy and judicial efficiency are not among them . . . ."); *United States v. Brown*, 879 F.3d 1043, 1051 (9th Cir. 2018) (Owens, *J.*, concurring) ("All good things must come to an end. But apparently bad legal doctrine can last forever, despite countless judges and justices urging an end to the so-called *Taylor* categorical approach."); *Ovalles v. United States*, 905 F.3d 1231, 1253 (11th Cir. 2018) (en banc) (Pryor, *J.*, concurring) ("How did we ever reach the point where this Court, sitting en banc, must debate whether a carjacking in which an assailant struck a 13-year-old girl in the mouth with a baseball bat and a cohort fired an AK-47 at her family is a crime of violence? It's nuts. And Congress needs to act to end this ongoing judicial charade."); *United States v. Chapman*, 866 F.3d 129, 139 (3d Cir. 2017) (Jordan, *J.*, concurring) ("Forcing judges to close their eyes to what is obvious promotes inefficiency and guarantees difficult-to-explain sentences."); *United States v. Valdivia-Flores*, 876 F.3d 1201, 1210 (9th Cir. 2017) (O'Scannlain, *J.*, specially concurring) ("I write separately to highlight how [this case] illustrates the bizarre and arbitrary effects of the ever-spreading categorical approach for comparing state law offenses to federal criminal definitions."); *United States v. Faulls*, 821 F.3d 502, 516 (4th Cir. 2016) (Shedd, *J.*, concurring) ("[T]he categorical approach is the antithesis of individualized sentencing; we do not consider what the individual to be sentenced has actually done, but the most lenient conduct punished by his statute of conviction."); *United States v. Doctor*, 842 F.3d 306, 313 (4th Cir. 2016) (Wilkinson, *J.*, concurring) ("[T]he categorical approach can serve as a protracted ruse for paradoxically finding even the worst and most violent offenses not to

3

constitute crimes of violence."); *United States v. Aguila-Montes de Oca*, 655 F.3d 915, 917 (9th Cir. 2011) (en banc) (Bybee, *J.*) ("In the twenty years since *Taylor*, we have struggled to understand the contours of the Supreme Court's [categorical approach] framework. Indeed, over the past decade, perhaps no other area of the law has demanded more of our resources.").

MENASHI, *Circuit Judge*, concurring in part and concurring in the judgment:

I agree with the court that first-degree manslaughter in violation of section 125.20(1) of the New York Penal Law is a violent felony under the Armed Career Criminal Act ("ACCA") and a crime of violence under the Career Offender Guideline because it has as an element the "use … of physical force against the person … of another," 18 U.S.C. § 924(e)(2)(B)(i), even though it may be committed by omission.

I disagree with the court's opinion only insofar as it insists that this conclusion follows from the "'ordinary,' 'natural,' 'everyday meaning'" of the statutory language. *Ante* at 22.[1] In my view, the court's argument depends on a specialized, legal meaning of the statutory text that follows from how the criminal law and controlling precedent treat omissions and assign culpability. The court explains that "omission—the breach of a legal duty to act"—has "a specialized meaning at law, which equates not to *inaction*, but to *action* supporting criminal culpability" and therefore "an omission is as much an 'act' under the criminal law as a person's voluntary physical movements." *Id.* at 24, 39. Applicable precedent holds that "a defendant's use of [physical] force does not depend on *his* having forceful contact—or indeed any physical contact—with his injured victim" but rather "what matters is that the defendant must have knowingly and intentionally caused an injury that can result only from the use of physical force." *Id.* at 28 (describing *United States v. Castleman*, 572 U.S. 157 (2014)). For these reasons, when a defendant "breaches a legal duty to check or redress force already in motion," he may have taken

---

[1] Unless otherwise noted, "ante" refers to the opinion of the court.

"no *physical* action" but his conduct is nevertheless "*culpable* action in the eyes of the law" because the law deems it to be "the action that causes death by the use of violent force." *Id.* at 26-27. The law thereby considers the defendant to use force when he "knowingly *avails* himself of the violent force that results in death." *Id.* at 30.

The court assumes, as courts normally do, that when Congress drafted the statutory language in the ACCA, "it was aware of these background [legal] principles recognizing that the elements of a crime … can be satisfied by acts of omission as well as acts of commission." *Id.* at 35-36. Because the purpose of the ACCA's force clause "is to define a 'violent felony' by reference to the elements of such a crime," it makes sense to understand the ACCA's reference to those elements in the way the elements are understood. *Id* at 35. I agree with the court's overall argument and therefore concur in the judgment.

It is hard, however, to conclude that this argument simply applies the "everyday meaning" of ordinary speech. *Id.* at 22. Rather, the panel was right that "the ordinary meaning of the terms of ACCA are not satisfied by inaction" or omission. *United States v. Scott*, 954 F.3d 74, 87 (2d Cir. 2020). Yet that linguistic point is not dispositive. "When the American legal system interprets a text, the process often looks nothing like a straightforward search for linguistic meaning."[2] The ultimate objective is to determine the meaning the law assigns to the text and therefore its legal effect.[3] In this case, even if an ordinary

---

[2] William Baude & Stephen E. Sachs, *The Law of Interpretation*, 130 HARV. L. REV. 1079, 1088 (2017).

[3] *See id.* at 1083 ("The crucial question for legal interpreters isn't 'what do these words mean,' but something broader: What law did this instrument

speaker of English might assume that a "use of physical force" entails a physical act, the legal meaning of the phrase includes omissions because the law treats an omission the same as a physical act, and we properly assume that Congress is familiar with that legal background when it legislates. I would not collapse the distinction between the ordinary meaning and the legal meaning because the distinction has important implications for how the categorical approach is applied.

**I**

In my view, the ordinary meaning of "use of physical force" does not include an omission or failure to act.

First, the ordinary meaning of 18 U.S.C. § 924(e)(2)(B)(i) cannot be determined from reading the term "use" in isolation from the statutory phrase "use … of physical force." A few "words together may assume a more particular meaning than those words in

---

make? How does it fit into the rest of the *corpus juris*? What do 'the legal sources and authorities, taken all together, *establish*'?"); *see also* John O. McGinnis & Michael B. Rappaport, *The Constitution and the Language of the Law*, 59 WM. & MARY L. REV. 1321, 1326 (2018) ("A document written in the language of the law … contains both ordinary language and legal language."); ANTONIN SCALIA, *Common-Law Courts in a Civil Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws, in* A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 3, 17 (1997) (noting that in statutory interpretation we look for "the intent that a reasonable person would gather from the text of the law, placed alongside the remainder of the *corpus juris*"); H.L.A. HART, *Definition and Theory in Jurisprudence, in* ESSAYS IN JURISPRUDENCE AND PHILOSOPHY 21, 26 (1983) ("[T]he language involved in the enunciation and application of rules constitutes a special segment of human discourse with special features which lead to confusion if neglected.").

isolation," *FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011), and that is the case here. One ought to identify the ordinary meaning of the relevant phrase whenever "two words combine to produce a meaning that is not the mechanical composition of the two words separately."[4] It is important not to isolate individual words in a statutory phrase because "[w]hat a word signifies depends not only on generic properties of the conceptual domain, but on the situation being described at the moment,"[5] and therefore meaning is lost by considering the words in isolation.[6] "An 'American flag' could literally encompass a flag made in America," but that is not the ordinary meaning of the phrase. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1826 (2020) (Kavanaugh, J., dissenting).

Second, the ordinary meaning of a phrase is just that: the meaning associated with the *ordinary* or *prototypical* use of the phrase

---

[4] WILLIAM N. ESKRIDGE JR., INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 44-45 (2016).

[5] HERBERT H. CLARK, ARENAS OF LANGUAGE USE 372 (1993).

[6] *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 144 n.7 (2d Cir. 2018) (Lynch, J., dissenting) ("Legislation cannot sensibly be interpreted by stringing together dictionary synonyms of each word and proclaiming that, if the right example of the meaning of each is selected, the 'plain meaning' of the statute leads to a particular result. No theory of interpretation, including textualism itself, is premised on such an approach."); *Helvering v. Gregory*, 69 F.2d 809, 810-11 (2d Cir. 1934) (L. Hand, J.) ("[T]he meaning of a sentence may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create."); *N.Y. Tr. Co. v. Comm'r*, 68 F.2d 19, 20 (2d Cir. 1933) (L. Hand, J.) ("[A] sterile literalism … loses sight of the forest for the trees.").

4

rather than any meaning that is *linguistically possible*. *See, e.g., Chisom v. Roemer*, 501 U.S. 380, 410 (1991) (Scalia, J., dissenting) ("[O]ur job is not to scavenge the world of English usage to discover whether there is any possible meaning … which suits our preconception [of] the statute."). The phrase "use of physical force" prototypically refers to assertive physical contact—"punches, kicks, slaps and body slams"[7]—but not to omissions.[8]

Yet the court relies on the idea that it is linguistically possible to say one "use[s]" physical force when one "derive[s] service from such force." *Ante* at 26. It is admittedly *possible* to say that a person "uses physical force" whenever she drives a car and it propels her forward, but that is not an *ordinary* way to describe driving. Nor is it the prototypical meaning associated with "use of physical force."[9] I

---

[7] Rachel Mendleson & Wendy Gillis, *Police punches, kicks, slaps and body slams are going untracked in Ontario. That's because much of the physical force officers use is not reported—and there are growing calls for that to change*, TORONTO STAR (Dec. 16, 2020), https://bit.ly/3bQesal (last visited Jan. 18, 2021).

[8] The Corpus of Contemporary American English—the most widely used corpus of American English—contains forty-seven non-specialist instances of "use of physical force" and all refer to physical contact; none plausibly refer to "deriv[ing] service from" a preexisting physical force. *Ante* at 26. Corpus linguistics illustrates the prototypical uses of words or phrases. *See State v. Rasabout*, 356 P.3d 1258, 1275 (Utah 2015) (Lee, Assoc. C.J., concurring in part and concurring in the judgment); Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. 788 (2018); *see also* Kevin P. Tobia, *Testing Ordinary Meaning*, 134 HARV. L. REV. 726, 753 (2020) (noting that in experiments "users of legal corpus linguistics tended to identify prototypical examples").

[9] The court acknowledges that when a person derives service from physical force for the purpose of transportation, "one would not ordinarily say that

would adhere to the principle that the "ordinary meaning" of a term is its *prototypical* meaning rather than a possible meaning.

In *Smith v. United States*, 508 U.S. 223 (1993), on which the court's opinion relies, the Supreme Court arguably departed from this principle and relied on possible meanings. *See id.* at 242 (Scalia, J., dissenting) ("The Court does not appear to grasp the distinction between how a word *can be* used and how it *ordinarily* is used.").[10] Indeed, Justice Scalia pointed to *Smith* to illustrate "a degraded form of textualism that brings the whole philosophy into disrepute."[11] I would not extend *Smith*'s conception of "ordinary meaning" to the circumstances of this case. The Supreme Court has limited the reach of *Smith*, *see Watson v. United States*, 552 U.S. 74, 81 (2007), and at least one Justice disavowed it. "I am persuaded that the Court took a wrong turn in *Smith v. United States*," wrote Justice Ginsburg.

---

[the] person is using physical force." *Ante* at 24 n.15. Yet the court insists that when a person derives service from physical force for the purpose of causing injury, "one would easily say just that." *Id.* The court's example—a person who "drives the car into a crowd"—is one in which the person actively employs force against others rather than merely derives service from such force. *Id.* An analogous person who simply derives service from the car's force by omitting to act for the purpose of causing injury would not ordinarily be described as using physical force.

[10] *See also Smith*, 508 U.S. at 242 (Scalia, J., dissenting) ("When someone asks, 'Do you use a cane?,' he is not inquiring whether you have your grandfather's silver-handled walking stick on display in the hall; he wants to know whether you walk with a cane. Similarly, to speak of 'using a firearm' is to speak of using it for its distinctive purpose, *i.e.*, as a weapon.").

[11] SCALIA, *supra* note 3, at 23 & n.30; *see also id*. at 24 ("[T]he good textualist is not a literalist.").

"Accordingly, I would overrule *Smith*, and thereby render our precedent both coherent and consistent with normal usage." *Id.* at 84 (Ginsburg, J., concurring in the judgment).[12]

## II

Even though the ordinary meaning of the phrase "use of physical force" entails a physical act, the legal meaning of that phrase includes culpable omissions.

The court's opinion articulates the reasons why: the criminal law equates omission with action when a legal duty exists,[13] and

---

[12] The agreement between Justices Scalia and Ginsburg reflects a larger critique by commentators. *See, e.g.*, Amy Coney Barrett, *Assorted Canards of Contemporary Legal Analysis: Redux*, 70 CASE W. RES. L. REV. 855, 857-59 (2020) (describing the "caricature" of "literalism" the majority applied in *Smith v. United States* and distinguishing it from sound textualism); Stefan Th. Gries & Brian G. Slocum, *Ordinary Meaning and Corpus Linguistics*, 2017 B.Y.U. L. REV. 1417, 1454, 1462 (2017) (considering the "infamous case" of *Smith v. United States* and concluding that "the Court's interpretation … is incompatible with the ordinary-meaning approach the Court claims it is applying"); LAWRENCE M. SOLAN, THE LANGUAGE OF STATUTES: LAWS AND THEIR INTERPRETATION 57 (2010) (noting that the analysis in *Smith* "was not really about the ordinary meaning"); John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2460-61 (2003) (contrasting the "literal interpretation of 'using a firearm'" in *Smith*, which produced "results that, to many, seem absurd or unjust," with "modern textualists" who "view the text[] in context"); William N. Eskridge, Jr., *All About Words: Early Understandings of the "Judicial Power" in Statutory Interpretation, 1776-1806*, 101 COLUM. L. REV. 990, 1093 n.509 (2001) ("Scalia's dissenting opinion in *Smith v. United States* is exemplary of a reasonable user textualism which is sensitive to context and even equity.") (internal citation omitted).

[13] *Ante* at 34 ("[T]he 'act' required by law is not dependent on a defendant's physical movements. Rather, the law recognizes that a person can also 'act'

applicable precedent treats a defendant's knowing causation of bodily injury as a use of physical force.[14] Once we acknowledge, as all parties here must, that when a defendant "sprinkles poison in a victim's drink," the "'use of force' … is not the act of 'sprinkling' the poison" but is "the act of employing poison knowingly as a device to cause physical harm," *Castleman*, 572 U.S. at 171 (alteration omitted), we are already applying a specialized rather than ordinary meaning of "use of force."

Terms in legal documents often have a "specialized meaning" under the law,[15] and indeed the purpose of the ACCA's force clause is "to define a 'violent felony' by reference to the elements" of state-law crimes, so the ACCA is properly read to reflect this legal

---

to commit a crime by failing to perform a legal duty.") (citing 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW §§ 6.1(a)-(e), 6.2 (3d ed. 2018); 1 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 25 (15th ed. 1993)); *see* N.Y. Penal Law § 15.00(5) ("'To act' means either to perform an act or to omit to perform an act."); *id.* § 15.00(3) (defining "omission" as "a failure to perform an act as to which a duty of performance is imposed by law"); *id.* § 15.10 ("The minimal requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which he is physically capable of performing."); *see also ante* at 35 n.25.

[14] *Ante* at 29 ("[F]ollowing *Castleman*, 'the inquiry as to "force," for federal law purposes, focuses on the causation of a consequence, rather than the physical act of initiating an action that leads to a consequence.'") (quoting *Villanueva v. United States*, 893 F.3d 123, 128 (2d Cir. 2018), which in turn applies *Castleman*, 572 U.S. at 169).

[15] *Ante* at 34 (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 73 (2012)).

understanding.[16] When interpreting the ACCA, moreover, the Supreme Court has emphasized the common law background against which Congress legislates.[17] As the court notes, the legal treatment of omissions as culpable acts is rooted in the common law.[18]

Given this background, a reasonable legal interpreter familiar with the *corpus juris* would recognize that a crime which has as an element the "use … of physical force" would comfortably include a crime, such as manslaughter, that may be committed by omission.[19]

---

[16] *Id.* at 35.

[17] *See Stokeling v. United States*, 139 S. Ct. 544, 551 (2019) (noting that "Congress, in the original ACCA," included "a clear reference to the common law of robbery" and that the common law continues to inform "the 'force' required"); *Castleman*, 572 U.S. at 162-63 ("Congress incorporated the common-law meaning of 'force'—namely, offensive touching—in § 921(a)(33)(A)'s definition of a 'misdemeanor crime of domestic violence.'"); *Curtis Johnson v. United States*, 559 U.S. 133, 139 (2010) (noting the general rule that "a common-law term of art should be given its established common-law meaning" but that "[u]ltimately, context determines meaning"). Here, unlike *Curtis Johnson*, there is no countervailing context.

[18] *Ante* at 25 (noting "the common law background recognizing omission as action"); *id.* at 34 (noting that the equivalency between omission and action is "originally rooted in common law").

[19] *See Moskal v. United States*, 498 U.S. 103, 121 (1990) (Scalia, J., dissenting) ("[I]n declaring [the layman's understanding] to be the governing criterion, rather than the specialized legal meaning [of] the term … the Court makes a mistake."); s*ee also* JOEL PRENTISS BISHOP, COMMENTARIES ON THE WRITTEN LAWS AND THEIR INTERPRETATION 4-5 (1882) ("Whatever may be the rules of interpretation, and however known, obviously no statute can be understood except by him who understands the prior law. … Every statute, as just said, combines and operates with the entire law whereof it becomes

## III

Recognizing the distinction between ordinary and legal meaning can reduce the "absurdity" or "inconsistent results" that sometimes afflict applications of the categorical approach. *Ante* (Park, J., concurring) at 1. Interpretative consistency helps to prevent absurd results.

In this case, for example, the ordinary meaning of "use … of physical force" does not include omissions. *See supra* Part I. But the ordinary meaning of the state manslaughter statute—in which the relevant phrase is that the defendant "causes the death" of the victim—does not include omissions either. N.Y. Penal Law § 125.20(1). At oral argument, Scott's counsel acknowledged that one would not conclude, based on the ordinary meaning of the state statute, that it could be violated by omission.[20] As the court explains, Scott's argument relies on the "specialized meaning" or "legal definition" of the terms of the state statute to conclude that first-degree manslaughter may be committed by omission, but his argument then shifts to the ordinary meaning when interpreting the language of the ACCA to exclude manslaughter by omission from the

---

a part; so that, without a discernment of the original mass, one can form no correct idea of the action of the new element.").

[20] Tr. of Oral Arg., Nov. 6, 2020, at 80 ("[W]hen New York law deems the inaction the cause of death, that's a kind of legal fiction. It's by operation of law. Because we know the actual cause of death is the heart attack or the asthma attack or what have you. But the reason that we as a society hold the caregiver responsible for that and therefore deem him the cause is that he has a duty to act, and [he] … didn't act."); Oral Arg. Audio Recording at 1:53:49.

category of violent felonies. *Ante* at 25. The court faults Scott for offering "no rationale" for applying inconsistent interpretive approaches "at different steps in the categorical analysis." *Id.*

The district court also relied on these inconsistent interpretive approaches to the state statute and the ACCA. To conclude that first-degree manslaughter under section 125.20(1) of the New York Penal Law may be committed by omission, one must read "causes the death" in accordance with a legal meaning established by reference to legal principles and precedents external to the statutory text.[21] But to conclude that the phrase "use … of physical force" excludes crimes committed by omission from the definition of "violent felony," the district court applied only the ordinary meaning of the phrase while ignoring the legal principles and precedents that show it encompasses

---

[21] *See United States v. Scott*, No. 06-CR-988, 2017 WL 2414796, at *2 (S.D.N.Y. June 2, 2017) ("In *Steinberg*, the Court of Appeals held that a parent's failure to fulfill his non-delegable duty to provide his child with medical care, which is an omission, can form the basis of a homicide charge and can support a charge of first degree manslaughter, as long as there is sufficient proof that the defendant intended to cause serious physical injury. The *Steinberg* Court noted that, under the Penal Law, 'the failure to perform a legally imposed duty'—*i.e.*, inaction—is a culpable omission. Based on these principles, the *Steinberg* Court held that the denial of medical care to the child was sufficient to support the defendant's first degree manslaughter conviction.") (internal citations omitted); *see also People v. Steinberg*, 79 N.Y.2d 673, 680 (1992) ("The Penal Law provides that criminal liability may be based on an omission, which is defined as the failure to perform a legally imposed duty. Parents have a nondelegable affirmative duty to provide their children with adequate medical care. Thus, a parent's failure to fulfill that duty can form the basis of a homicide charge.") (internal citations omitted).

11

crimes of omission.[22] That interpretive mismatch—reading the state statute in accordance with its legal meaning but the ACCA in accordance with its ordinary meaning—determined in advance that the state statute would not be a categorical match under the ACCA's force clause.

That is not a sensible way to apply the categorical approach. It expands the state statute and narrows the ACCA, preventing the state statute from being a categorical fit and making the approach more likely to generate absurd results. One may lament "that's the categorical approach for you." *United States v. Mayo*, 901 F.3d 218, 230 (3d Cir. 2018). But the categorical approach is "a means of effectuating congressional intent," *United States v. Simms*, 914 F.3d 229, 240 (4th Cir. 2019) (en banc), and there is no reason to think Congress wanted to produce such results.

A sounder approach would be for a court to apply the same interpretive method to the state statute that it applies to the relevant clause of the ACCA—understanding each statute in accordance with its legal meaning rather than oscillating between legal and ordinary meaning "at different steps in the categorical analysis." *Ante* at 25. That would reflect a more reasonable application of the categorical approach and the court's obligation to determine the meaning the law assigns to a text.[23]

---

[22] *See Scott*, 2017 WL 2414796, at *2 (asserting that "an act of omission … by definition does not involve an act of any kind, let alone the use of force"). *But see supra* note 13 and accompanying text (noting that the criminal law treats an omission as an act).

[23] *See supra* note 3.

\* \* \*

While the ordinary meaning of "use … of physical force" does not include omissions, the legal meaning does. Because a court's ultimate task is to give legal effect to a statute, the legal meaning takes precedence over the ordinary meaning. To avoid interpretive mismatch, a court following the categorical approach should evaluate the legal meaning of both the state statute and the ACCA. I understand the court's decision to follow from the legal meaning of the state statute and the ACCA, and therefore I concur in the court's opinion—excepting only those parts purporting to rely on ordinary meaning—and in the judgment.

LEVAL, *Circuit Judge*, dissenting, joined by KATZMANN, LOHIER, and CARNEY, *Circuit Judges*, and joined in part by POOLER, *Circuit Judge*.[1]

I respectfully dissent. I cannot join in requiring imposition of a harsh *mandatory* minimum term of imprisonment – a term that must be imposed regardless of whether it is merited – for actions that are not clearly within the statute's definition of the crime. I join in Judge Pooler's fine opinion to the extent it dissents from the imposition of ACCA's mandatory minimum term of 15 years imprisonment where ACCA's definition of the offense as requiring "the use, attempted use, or threatened use of physical force against the person of another" does not clearly apply to a crime that can be committed by doing nothing at all.

The legal basis for my opinion is the rule of lenity. That rule requires criminal statutes to give clear notice and warning of the conduct that will be punished, *see United States v. Bass*, 404 U.S. 336, 347-48 (1971), failing which, the ambiguity will be interpreted in favor of the defendant, *see United States v. Santos*, 553 U.S. 507, 514 (2008). Reliance on the rule of lenity has a special importance when the legislature has passed harsh mandatory sentences which are then imposed for crimes to which they do not clearly apply. Especially in a system in

---

[1] Judge Pooler does not join in Judge Leval's position on the Guidelines.

1

which sentences are reviewable on appeal, statutes making harsh sentences mandatory hardly ever serve a useful purpose, and inevitably guarantee instances of serious, needless injustice.

The rule of lenity protects the public from being punished for conduct that is not clearly prohibited. *See id*. As explained by Justice Oliver Wendell Holmes Jr., it is premised on fairness – the notion that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle v. United States*, 283 U.S. 25, 27 (1931); *see also Bass*, 404 U.S. at 348. The rule was adopted in England in the late seventeenth century as a means, in unclear cases, of circumventing the mandatory death sentences Parliament had widely imposed even for such low-level crimes as pickpocketing. *See* Sarah Newland, *The Mercy of Scalia: Statutory Construction and the Rule of Lenity*, 29 HARV. C.R.-C.L. L. REV. 197, 200 (1994). The rule enabled courts in cases of statutory ambiguity to avoid having to order unjust executions.

The majority opinion devotes considerable ink to telling us what an atrocious beast Scott is, what little justification he has to complain of lack of

2

notice, and how deserving he is of substantial punishment. If our concern were limited to the effect of the majority ruling on Scott himself, I would not disagree in the least that his conduct warrants severe punishment. (If the majority had found the sentence ultimately imposed on him by the District Court to be unreasonably lenient and had remanded for imposition of a more severe discretionary sentence, I would have no objection and might even concur.) But the appropriateness of imprisoning Scott for 15 years does not make 15 years an appropriate or fair sentence for everyone who will come within ACCA's scope on the basis of a New York first-degree manslaughter conviction. When a court interprets a statute, especially a statute that imposes a mandatory sentence, the court cannot limit its consideration to the effect of the statute on the particular litigant before the court. Because the issue here is a mandatory sentence, the most significant effect of the majority opinion is not that it requires a small increase in Scott's already substantial punishment, nor that it will mandate a long term of imprisonment for *deserving* future defendants (who regardless would receive severe, substantially similar terms), but rather that it will require a 15-year imprisonment of defendants for whom a sentence of such harshness will be unjust and for whom the statute does not give fair notice.

The ambiguity that justifies invocation of the rule of lenity in this case is that ACCA's definition of a "violent felony" (an essential element of one of the pathways to satisfaction of the statutory requirements) does not clearly cover all of the ways in which the New York crime of first-degree manslaughter can be committed. As thoroughly explained by Judge Pooler, the highest court of New York has made unmistakably clear that manslaughter can be committed by doing nothing when the defendant had a legal duty to protect the victim and the defendant's inaction was motivated by the intention to cause serious physical injury. *See People v. Steinberg*, 79 N.Y.2d 673, 680 (1992). ACCA, as noted above, specifies that the term "violent felony" means a felony that "has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). While many forms of conduct punishable in New York as first-degree manslaughter undoubtedly fit within this definition, as to other types of covered conduct, the question is ambiguous at least. The majority opinion performs contortions in an effort to demonstrate that any inaction that is intended to cause serious physical injury and causes death necessarily utilizes physical force. However, to make the case, it chooses hypotheticals that favor its conclusion – such as intentionally declining to

4

intervene to prevent the victim from taking a drink known by the defendant-caretaker to contain poison, thus "using" the destructive force of the poison. Other hypotheticals, such as failing to provide food for one who is not capable of providing it for himself, might yield a different answer, as the death would result from lack of nutrition needed to fuel the operation of the body, rather than from the introduction of an alien destructive force.

Suppose a 70-year-old woman's ACCA-qualifying manslaughter conviction occurred as follows. Her father, age 95, afflicted with an incurable degenerative disease that left him paralyzed, suffering, without hope for better, and facing a certain, imminent, and excruciatingly painful death, begged his loving caregiver-daughter to cease putting nutrition in his IV, to allow him to escape the torture by starving. After long watching her father suffer as she wrestled with her moral dilemma, she eventually complied as an act of love and mercy. She immediately confessed, and pleaded guilty to manslaughter.[2]

May a legislature lawfully command a fifteen-year sentence for such a crime? Undoubtedly, yes. Does ACCA's specification of a "use of physical force

---

[2] The additional requirements of her ACCA conviction are supplied by the fact that, when she was 18 years old, she twice carried drugs for her drug-dealing boyfriend, and, when her father became infirm, he deeded to her his house and its contents, which included his treasured hunting rifle.

against the person of another" unambiguously give "fair warning," as the Holmes formulation requires, that it covers not supplying nourishment? I think not. Many, furthermore, would think it a barbaric abuse to sentence the daughter to imprisonment for 15 years.

I of course recognize that, while my hypothetical placed the withholding of food in circumstances sympathetic to the defendant, the commission of manslaughter in that fashion is probably more often, as in *Steinberg*, a crime of heartless and inexcusable cruelty. Every criminal case presents a unique circumstance, and what is appropriate for most can nonetheless be extraordinarily unjust for others. This is precisely why harsh *mandatory* sentences inevitably become engines of needless injustice.

While harsh sentences are undoubtedly appropriate and desirable in many cases, the lack of necessity or justification for making them mandatory, and the serious injustices that such sentences inevitably produce are what motivates this dissent. Any criminal punishment must balance the interests of society in discharging the goals of the criminal law with the need of fairness to the defendant. That balancing depends on the specific facts of each case. The sentencing of a sixteen-year-old for killing his stepfather to protect his mother

from brutal beatings poses very different considerations from the sentencing of one who committed a contract killing for pay, or shot a stranger to death in order to steal his Porsche. A statute that mandates the same sentence for all of these will fail to do justice.

The basic federal sentencing statute, 18 U.S.C. § 3553, recognizes the fact-dependent nature of sentencing. It requires courts to consider "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1), as well as "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant." *Id.* § 3553(a)(2). In what is called the "parsimony clause," it further requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. *Id.* § 3553(a).

Harsh mandatory sentences require courts to disregard or violate the wise commands of § 3553. *Cf. United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("Plainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the

7

parsimony clause, impose the higher."). Notwithstanding the careful, fact-dependent analysis appropriately required by § 3553 before a sentence is imposed, mandatory sentences strip away all consideration of the crucially important circumstances that are unique to each defendant and each case. The proposition that the legislature, necessarily ignorant of the facts of a crime that has not yet occurred, can dictate in advance a more appropriate sentence than the court that studies the facts of the case is, to say the least, not highly persuasive. I do not question that the harsh sentences mandatorily imposed by legislatures for serious crimes may well be appropriate in the large majority of cases. Nonetheless, there will inevitably be cases for which a one-size-fits-all mandatory sentence will inflict serious injustice. The question therefore arises whether the need for a severe sentence in the large majority of cases justifies the requirement to impose that sentence in the smaller number of cases where it will cause injustice.

It does not. In fact, mandatory imposition of harsh sentences for serious crimes serves little or no useful purpose. If the legal procedures in the federal courts delegated the sentencing function to chimpanzees, there might well be a utility for statutes precisely dictating minimum and maximum sentences. But

sentencing is done by well qualified judges who, as required by law, study the facts of the case and, when permitted to do so, decide on an appropriate sentence pursuant to the detailed standards of § 3553. Because most instances of serious crimes appropriately call for substantial sentences, in the vast majority of cases the sentencing judge will impose a sentence of substantial severity, one that is not significantly different from the one mandated by the legislature, without need for a mandatory sentencing statute. This is because the judges have the same interest as the legislature in carrying out the purposes of the criminal laws. And in the rare case in which a sentencing judge imposes a sentence that is unreasonably lenient in light of the pertinent circumstances, the government may appeal to have a substantively unreasonable sentence set aside.[3] *See United States v. Ramos*, 979 F.3d 994, 998 (2d Cir. 2020) ("[W]e check the sentence to ensure . . . that the sentence is not unreasonably harsh or unreasonably lenient."); *see also, e.g., United States v. Mumuni*, 946 F.3d 97, 113-14 (2d Cir. 2019) (overturning an

---

[3] Another, likely unintended, consequence of mandatory sentencing is that it transfers discretion from the sentencing judge – who is constrained by 18 U.S.C. § 3553 and subject to judicial review – to prosecutors, who have almost absolute discretion to choose which charges to bring, and therefore which mandatory sentences will apply. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("[T]he decision whether or not to prosecute, and what charge to file . . . generally rests entirely in [the prosecutor's] discretion.").

unreasonably lenient sentence that represented an 80% downward departure

from the recommended Guidelines range).

The net result is that the instances in which harsh mandatory sentencing statutes substantially influence the sentence are not those involving offenders who deserve the harsh sentences. Those defendants would receive similarly harsh sentences regardless of whether the sentence was mandatory. At least where the mandatory sentence chosen by the legislature reasonably comports with just punishment (unlike the seventeenth century English Parliament's death sentence for even minor crimes), the main practical effect of such statutes is to cause serious injustice in a minority of cases by requiring far harsher sentences than the facts of the case can justify.

Courts are of course compelled to enforce statutory commands in the circumstances to which they apply. I recognize also the Supreme Court's caution that the rule of lenity is to be sparingly employed. *See Shular v. United States*, 140 S. Ct. 779, 787 (2020) ("The rule [of lenity] 'applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.'" (quoting *United States v. Shabani*, 513 U.S. 10, 17 (1994))). Statutes imposing harsh mandatory sentences present a particularly compelling need for

invocation of the rule of lenity. The 15-year mandatory sentence required by ACCA should be applied only to crimes to which it clearly applies; its requirement of "use of physical force against the person of another" does not clearly apply to a crime that can be committed by doing nothing.

Turning now to the question whether New York first-degree manslaughter is a "crime of violence" for purposes of the "career offender" provision of U.S.S.G. § 4B1.1(a), I do not join in Judge Pooler's conclusion that it is not, although I recognize that the Guidelines definition of "crime of violence" is identical to ACCA's definition of "violent felony" – as involving "the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i); U.S.S.G. § 4B1.2(a)(1). Are my positions inconsistent? I do not think so. The significant difference is that the United States Sentencing Guidelines, unlike ACCA's requirement of a mandatory minimum sentence, do not compel adherence to their terms. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007). Courts are free to impose sentences outside the prescribed Guidelines ranges, either by departing in the manner expressly authorized by the Guidelines

or by electing to sentence outside the Guidelines framework. *Id.* The Guidelines do not compel unjust sentences.

A degree of ambiguity is therefore far more tolerable in a sentencing rule that is merely advisory, and the need for resort to the rule of lenity is considerably diminished. As there are reasonable arguments for classifying manslaughter as a crime of violence, notwithstanding that manslaughter by inaction, at least in some manifestations, does not necessarily involve use of physical force, I would not invoke the rule of lenity with regard to the Guidelines' career offender provision.[4]

For the reasons explained, I dissent from the majority's application of a harsh mandatory sentencing statute to a circumstance to which it does not clearly apply, where the majority's debatable interpretation will cause serious injustices without any significant benefit to the realization of the objectives of the criminal law.

---

[4] I do not suggest that the rule of lenity has no application to the interpretation of the Guidelines. We ruled in *United States v. Parkins*, 935 F.3d 63, 66 (2d Cir. 2019), that it does, and I have no disagreement with that. My view is rather that the reasons for enforcing the rule of lenity are more urgent and compelling when the unavoidable consequence of the ambiguous provision would otherwise require harsh fixed sentences on all defendants, deserving and undeserving alike, than when the provision leaves the sentencing judge free to impose a sentence that is fair and appropriate to the particular defendant.

* * *

POOLER, *Circuit Judge*, dissenting, joined by LEVAL and CARNEY, *Circuit Judges*, in Parts I-IV:

I respectfully dissent. The majority concludes that New York Penal Law Section 125.20(1), which criminalizes causing an individual's death "[w]ith intent to cause serious physical injury," N.Y. Penal Law § 125.20(1), is a violent felony within the so-called force clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(i), notwithstanding that Section 125.20(1) punishes the failure to act in the face of a duty to do so. I disagree. I also conclude that Scott fails to qualify as a "career offender" under the United States Sentencing Guidelines ("Guidelines"), as defined by either the force clause or the so-called enumerated offenses clause. *See* U.S.S.G. § 4B1.2(a)(1)-(2).

For the many reasons already discussed in the original panel's opinion, *United States v. Scott*, the law and logic dictate only one possible outcome: a crime committed by omission—definitionally, no action at all—cannot possibly be a crime involving physical, violent force. *See* 954 F.3d 74, 77-92 (2d Cir. 2020). On en banc review, the majority finds this conclusion distasteful because of the nature of the crimes Scott committed. While I do not minimize the consequences of Scott's serious crimes, that is simply not a relevant consideration when

applying the modified categorical approach, which requires us to look at the basic legal elements of a particular crime. To avoid this conclusion, the majority skews the import of applicable precedent, uses inapplicable precedent to fill gaps in its reasoning, and unnecessarily broadens the application of mandatory minimums, often an overly harsh and unproductive sentencing tool that has been repeatedly criticized by experts on criminal justice and rehabilitation.

**I.    New York Penal Law Section 125.20(1) Is Not a Violent Felony Under the ACCA.**

At the outset, I address whether New York Penal Law Section 125.20(1) may be committed by omission. As the categorical approach instructs, we must determine the legally minimal conduct required for a defendant to be culpable for a particular crime, disregarding what the defendant factually did.[1] We consider only "realistic" readings of the criminal statute and require a defendant to "at least point to his own case or other cases in which the courts in fact did apply the statute in the manner for which he argues." *United States v. Hill*, 890

---

[1] In the case of a divisible statute like this one, we apply a "modified" categorical approach that permits us to focus exclusively on the elements of the subdivision of the statute under which Scott was convicted. *See United States v. Jones*, 878 F.3d 10, 16 (2d Cir. 2017).

F.3d 51, 56 (2d Cir. 2018) (alterations and internal quotation marks omitted). Scott did just that.

The New York Court of Appeals has twice indicated that Section 125.20(1) may be committed by omission. In *People v. Steinberg*, it stated, "the failure to obtain medical care can also support a first degree manslaughter charge, so long as there is sufficient proof of the requisite *mens rea*—intent to cause serious physical injury." 79 N.Y.2d 673, 680 (1992) (italics in original). In *Steinberg*, the child's need for medical care was precipitated by head trauma from an assault, *see id.* at 678-79, but the Court of Appeals nevertheless affirmatively addressed the prosecutor's separate liability theory based on omission, *id.* at 680 ("The people's theory . . . was that defendant performed *both* acts of commission (striking Lisa) and acts of omission (failure to obtain medical care) . . . ." (emphasis added)), and concluded that such an omission "can form the basis of a homicide charge," *id.* (citation omitted). *People v. Wong* subsequently eliminated any remaining confusion, finding that, under Section 125.20(1), a "passive defendant . . . may be held criminally liable for failing to seek emergency medical aid for a seriously injured child." 81 N.Y.2d 600, 608 (1993) (internal quotation marks omitted); *see also id.* at 606 (explaining that defendants were indicted and

tried on charges under, inter alia, Section 125.20(1)). The categorical approach requires a defendant to provide a "realistic" reading of the state's law, avoiding a "flight[] of fancy." *Hill*, 890 F.3d at 56. The New York Court of Appeals' explicit acknowledgement of criminal liability via omission is far from "legal imagination." *Id.* at 56. Therefore, Scott has met his burden of showing that Section 125.20(1) may be committed by omission. *See Scott*, 954 F.3d at 80-84.

In any event, the government has abandoned its argument to the original panel that Section 125.20(1) may not be committed by omission, a not-so-subtle attempt to reconcile its overbroad interpretation of the scope of omission liability used in its Guidelines argument with its position on the ACCA.

Accepting that Section 125.20(1) may be committed by omission, the subsequent analysis is relatively straightforward. Because the minimal conduct required to find culpability is omission in the face of a legal duty to act, we must consider whether this conduct qualifies as a predicate crime under the ACCA. As the majority explains, the key question is whether this conduct is a "violent

4

felony," that is, a crime that involves "the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i).[2]

A plain reading of the statutory text reveals that it sets mandatory minimum sentences for criminals who engage in "violent," "physical force against the person of another." *Id.* The Supreme Court has explained that this phrase refers to the degree of force used in the execution of a crime. *See Johnson v. United States*, 559 U.S. 133, 140 (2010). "[I]n the context of a statutory definition of '*violent* felony,' the phrase 'physical force' means *violent* force—that is, force capable of causing physical pain or injury to another person." *Id.* at 140 (emphases in original). In doing so, the Court disavowed the common law's definition of force in this context, concluding that crimes that may be "satisfied by even the slightest offensive touching" are not violent felonies under the ACCA; instead, the word "violent . . . connotes a *substantial degree* of force." *Id.* at

---

[2] This clause is at issue now because the Supreme Court invalidated the ACCA's so-called residual clause in *Samuel Johnson v. United States* while Scott was serving his sentence. 576 U.S. 591, 606 (2015). The definition of violent felony previously included any crime involving "conduct that presents a serious potential risk of physical injury to another." *Id.* at 596 (internal quotation marks omitted). The Supreme Court struck down this clause as unconstitutionally vague, leaving the force clause as the sole possible basis for Scott's mandatory minimum sentence of 15 years under the ACCA. *See id.* at 606; *see also* 18 U.S.C. § 924(e)(2)(B).

139-40 (emphasis added) (internal quotation marks omitted). The opinion describes qualifying acts as "extreme and sudden . . . ; furious; severe; vehement" and "characterized by the exertion of great physical force or strength." *Id.* at 140 (alteration and internal quotation marks omitted). *Johnson* explains that "the term 'physical force' . . . connotes force strong enough to constitute 'power'," especially when used within the definition of "violent felony." *Id.* at 142. [3]

Because Section 125.20(1) manslaughter may be committed by omission—e.g., intentionally refusing to obtain medical attention for a child who is experiencing an unprovoked serious medical condition—it fails to reach the threshold of great force, power, and violence set forth in *Johnson*. Indeed, *Johnson* held that even a Florida felony offense of battery, which criminalized "actually and intentionally touching" someone against their will, *id.* at 138 (internal quotation marks omitted), was not the type of violent, powerful predicate crime contemplated by the ACCA. Where even minimal touching does not qualify as relevant conduct, certainly, omission—definitionally, inaction—does not, either.

---

[3] Despite these clear descriptions and *Johnson*'s explicit statement that the clause requires "a degree of power that would not be satisfied by [even] the merest touching," *Johnson*, 559 U.S. at 139, the majority concludes that *Johnson* says nothing about what constitutes force and does not require the use of any physical act. This interpretation, which directly contradicts the clear language of the opinion, perplexes me.

Therefore, Scott's prior convictions do not subject him to the ACCA's mandatory minimum.[4]

**II.    The Majority's Conclusion Employs Faulty Reasoning.**

The majority rejects this straightforward reading of the ACCA and *Johnson*, concluding that crimes committed by omission also qualify as violent felonies. This conclusion is misguided. Both the government and the majority rely heavily on one line in *United States v. Castleman* to support their interpretation of violent felony under the ACCA: "the knowing or intentional causation of bodily injury necessarily involves the use of physical force." 572 U.S. 157, 169 (2014). The problem with their position is that *Castleman* interpreted a different statute with a different historical context and nowhere indicated that it sought to impact *Johnson*'s interpretation of "violent felony." This application of *Castleman* fails to account for what the Supreme Court repeatedly emphasized—that *Castleman*'s holding was specific to its statutory and legal context and was in no way meant to reverse or abrogate *Johnson*'s interpretation of physical force.

In *Castleman*, the Supreme Court contemplated whether a Tennessee crime of intentionally or knowingly causing bodily injury qualified as "a misdemeanor

---

[4] Two of Scott's three prior convictions were for New York first-degree manslaughter. *See Scott*, 954 F.3d at 78.

crime of domestic violence" under 18 U.S.C § 922(g)(9). *Id.* at 159 (internal quotation marks omitted). The Court explained that "perpetrators of domestic violence are routinely prosecuted under generally applicable assault or battery laws," suggesting that Congress intended to include "the type of conduct that supports a common-law battery conviction" under the category of "misdemeanor crime of domestic violence." *Id.* at 164 (internal quotation marks omitted). The Court therefore embarked on defining a "*misdemeanor-specific meaning of 'force'*." *Id.* (emphasis added). The phrase "domestic violence," unlike "violent felony," does not connote "a substantial degree of force." *Id.* at 164-65 (internal quotation marks omitted). Instead, the very nature of domestic violence often involves an escalating pattern of "seemingly minor" acts of violence, "the accumulation" of which "over time can subject one intimate partner to the other's control." *Id.* at 166. The Supreme Court emphasized that it is within this context of the peculiar nature of domestic violence that less forceful acts, such as common-law battery, qualify as a predicate crime under Section 922(g). The *Castleman* opinion carefully separated itself from the statutory context of *Johnson*. *See id.* at 163-67. Justice Scalia, who wrote the majority opinion in *Johnson*, concurred in part in *Castleman*, expressing concern that this splintered

8

understanding of "physical force" would muddy the waters and arguing that applying the *Johnson* understanding of force would have sufficed. *See id.* at 174-83. In doing so, Justice Scalia reaffirmed that, within the context of Section 924(e)(2)(B)(i)—the statute at issue here—"physical force [still] means violent force." *Id.* at 176 (italics and internal quotation marks omitted). Nothing within the *Castleman* opinion suggests that the one line on which the government and the majority rest their conclusions was meant to abrogate, or even affect, *Johnson*'s interpretation of "violent felony." Indeed, the *Castleman* Court explicitly stated that it "d[id] not reach" the general issue of "[w]hether or not the causation of bodily injury necessarily entails violent force." *Id.* at 167.

In *Villanueva v. United States*, a divided panel of this Circuit extracted the above-mentioned line from *Castleman* and interpreted it to mean that "'force,' for federal law purposes, focuses on the causation of a consequence, rather than the physical act of initiating an action that leads to a consequence." 893 F.3d 123, 128 (2d Cir. 2018). I dissented from that decision, *see id.* at 132-39, and continue to hold that *Villanueva* wrongly discarded the accurate understanding of physical force in *Chrzanoski v. Ashcroft*: "[T]he intentional causation of injury does not necessarily involve the use of force." 327 F.3d 188, 195 (2d Cir. 2003). In

9

*Chrzanoski*, we explained that a doctor deliberately withholding medicine from a sick patient is an example of "intentionally causing physical injury without the use of force." *Id.* at 196. This is analogous to the hypothetical first-degree manslaughter by omission we consider here.

Nevertheless, accepting that *Villanueva* is currently the law of our Circuit, there is no need to significantly expand its holding to a materially distinct and even further removed circumstance—one where a criminal defendant commits no act at all. In *Villanueva*, we contemplated a Connecticut first-degree assault statute, which required a defendant to cause injury "by means of a deadly weapon or a dangerous instrument" "[w]ith intent to cause serious physical injury to another person." *Villanueva*, 893 F.3d at 127 (citing Conn. Gen. Stat. § 53a-59(a)(1)). There was no indication that this crime may be committed by omission. Using a deadly weapon necessarily entails an act. Even the physically minimal acts of "sprinkling . . . poison" or "pulling the trigger on a gun," examples cited by the *Castleman* Court and referenced in *Villanueva*, require *some* action on the part of the defendant. *Id.* at 128 (brackets and internal quotation marks omitted). Here, we instead consider a situation where the defendant does nothing at all in the face of a legal duty to act, allowing an unprovoked set of

10

circumstances to reach its fatal or injurious conclusion. The majority makes short shrift of applying the same set of principles to two distinct circumstances, expanding *Villanueva*'s answer to encompass Scott's question.

The majority concludes the answer is the same, but they do so by shifting the focus of "force" from the defendant's conduct to the victim's injury. They posit that when a defendant intends harm to a victim, and the victim subsequently experiences harm, the defendant has inherently used physical force because the victim's harm necessarily occurred as the result of *some* force.[5] In doing so, the majority conflates actus reus, the physical act involved in committing a crime, and mens rea, the defendant's mental intention behind the act. The law recognizes that one may cause a fatal car accident without intending to (a crime, despite the lack of an intentional mens rea) and one may intentionally kill an individual without lifting a finger (a crime, despite the lack of an active actus reus). Although these concepts sometimes intersect and inform

---

[5] Of course, in many cases, the defendant *does* initiate the force that harms the victim, whether it is as overt as forcibly holding someone underwater or as indirect as filling a pool in hopes that a targeted victim, who the defendant knows cannot swim, may fall in and drown themselves. However, the very nature of the question before us asks us to exclude the possibility that the defendant did *anything* to bring about the victim's harm. Therefore, the force harming the victim is definitionally external to the defendant.

each other, they are distinct elements. "It is commonly stated that a crime consists of both a physical part and a mental part; that is, both an act or omission (and sometimes also a prescribed result of action or omission, or prescribed attendant circumstances, or both) and a state of mind." 1 WAYNE R. LAFAVE, Substantive Criminal Law § 5.1 (3d ed. 2020) [hereinafter "LAFAVE"]. The ACCA and *Johnson* specify that Section 924(e)(2)(B)(i) reaches a particular subset of crimes, those that involve a violent and forceful physical component, or actus reus. But the majority believes that an intent to kill or seriously injure—the mens rea—necessarily involves a violent physical act—the actus reus. This is simply not true.

A common example of a crime by omission is a guardian who lets a child die of a severe food allergy after the child consumes the dangerous food with no provocation from the guardian.[6] Suppose the guardian had been long

---

[6] The majority makes the unremarkable point that no New York Court of Appeals case has encountered this exact factual scenario. *See* Maj. Op. at 49 n.37. I do not suggest otherwise. What the Court of Appeals has made clear is that omission liability is applicable to New York first-degree manslaughter, *see Wong*, 81 N.Y.2d at 606, 608; *Steinberg*, 79 N.Y.2d at 680, so much so that the government did not even argue otherwise on rehearing en banc. This hypothetical simply provides readers with an example of omission liability for discussion purposes, a commonly used method when applying the categorical approach. *See e.g., Voisine v. United States*, 136 S. Ct. 2272, 2279 (2016); *Castleman*, 572 U.S. at 171.

contemplating how to eliminate the child. The child inadvertently consumes a dangerous food, through no act of the guardian, and the guardian watches the child die or collapse instead of calling for medical assistance, taking advantage of an unprovoked but dangerous situation. Although the guardian did so with the intent to cause harm, the guardian also physically did not *do* anything to facilitate the tragic end. This is not to say that the guardian's actions are not abhorrent or legally culpable. Indeed, by the New York Court of Appeals' rulings, the guardian would likely be guilty of first-degree manslaughter and be punished accordingly. However, the guardian did not engage in a physically violent act or use "a substantial degree of force." *Johnson*, 559 U.S. at 140 (internal quotation marks omitted). This does not mean the guardian would never be convicted for the death of the ward or that the guardian may not spend several years in prison for it. It means that, later, should the guardian be guilty of federal charges, the federal sentencing court would not be able to count this particular conviction as one of the three predicate crimes needed to impose the fifteen-year mandatory minimum articulated in 18 U.S.C. § 924(e).

Next, the majority conflates "action" with legal liability and culpability. The law does not view inaction as action; that would be physically and factually

13

impossible. However, the law creates *culpability* in both situations. While the law, and society, hold both active and passive criminals culpable, it is through different mechanisms and distinct theories. LaFave explains: "Most crimes are committed by affirmative action rather than by non-action. But there are a number of statutory crimes which are specifically defined in terms of failure to act; and other crimes which, though not specifically so defined, may be committed either by affirmative action or by failure to act under circumstances giving rise to a legal duty to act." LAFAVE § 6.2. Moreover, New York, like many other states, separately defines the terms "omission" and "act." *See* N.Y. Penal Law § 15.00 (defining "[a]ct" as "a bodily movement" and "[o]mission]" as "a failure to perform an act as to which a duty of performance is imposed by law"). It is therefore entirely reasonable that a mandatory minimum sentencing statute may seek to distinguish between the two types of crimes.

The majority also focuses on the word "use" in the phrase "use of physical force," 18 U.S.C. § 924(e)(2)(B)(i), concluding that it is best interpreted as to "employ it," "avail oneself of it," or "derive service from it." Maj. Op. at 22 (brackets and internal quotation marks omitted). Per the majority's interpretation, in the example of the malicious guardian above, although the

14

guardian did not set the events in motion, he or she nevertheless "use[d]" the fatal force of the allergy to harm or kill the victim. 18 U.S.C. § 924(e)(2)(B)(i). Although this may be one possible interpretation of the word, it is not a straightforward one. And the majority's supporting sources on this very specific interpretation apply to materially different contexts not applicable here. For example, in *Smith v. United States*, the Supreme Court held that a criminal defendant who uses a firearm as a currency of exchange in a drug deal, instead of as a weapon, is nevertheless subject to penalties under Section 924(c)(1), *see* 508 U.S. 223, 240-41 (1993), which specifies that a defendant who "uses or carries a firearm, or who in furtherance of [a crime of violence or drug trafficking crime], possesses a firearm," shall be sentenced to at least five years, 18 U.S.C § 924(c)(1). Of course, the word "use," just like any word, can mean a plethora of things when divorced from contextualizing words around it. But the Supreme Court was careful to clarify that "[l]anguage . . . cannot be interpreted apart from context." *Smith*, 508 U.S. at 229. *Smith*'s interpretation of "use" was inextricably tied to its context; the defendant "used or employed" and "derived service from" the gun as an "item of barter to obtain cocaine." *Id.* at 229 (internal quotation marks omitted). Even there, the defendant affirmatively initiated and committed

15

an act. The Supreme Court was parsing between different kinds of use, *see id.* at 232-33 (explaining that a defendant who "uses a firearm to scratch his head . . . or for some other innocuous purpose" does not necessarily qualify for the enhancement (internal quotation marks omitted)), not eliminating the distinction between active and passive crimes entirely.[7] Here, "use" is followed by the phrase "of physical force," 18 U.S.C. § 924(e)(2)(B)(i), which, as discussed, has already been interpreted by *Johnson*, 559 U.S. at 140, in a way that directly contradicts the majority's position.

The government seeks to bolster its position by arguing that many of our sister circuits have reached similar conclusions regarding the ACCA's force requirement. Of course, we are entitled—and obligated—to reach our own conclusions based on an accurate interpretation of the law. In any event, a closer look at the cited cases raises questions about their direct applicability. For example, in *United States v. Rumley*, the concurrence "[wrote] separately to

---

[7] *Voisine* is also inapplicable. Like *Castleman*, *Voisine* interprets the distinct statutory context of Section 922(g)(9), the misdemeanor crime of domestic violence. *See* 136 S. Ct. at 2276. Moreover, *Voisine* focuses on the mens rea portion of qualifying crimes, holding that "*acts* undertaken with awareness of their substantial risk of causing injury" may qualify. *Id.* at 2279 (emphasis added). This says nothing about crimes of inaction or omission. Even the central hypothetical of *Voisine*—hurling a plate near, but not at, one's spouse—uses a degree of force definitionally not contemplated here. *See id.* at 2279.

express . . . skepticism that omissions constitute violent force—an issue [the court] need not reach given that Rumley has not shown a realistic probability that omissions would be prosecuted under the statute." 952 F.3d 538, 551-52 (4th Cir. 2020) (Motz, J., concurring). The *Rumley* court considered whether indirect force, as opposed to omission, constitutes physical force under the ACCA. *See id.* at 549. The crime at issue was Virginia's unlawful wounding statute, which criminalized the causation of "bodily injury by any means and with the intent to maim, disfigure, disable or kill." *Id.* at 550 (internal quotation marks omitted). In doing so, the majority explicitly discredited Rumley's argument that there was a realistic probability that omission could create culpability under Virginia law. *See id.* at 551. Although the majority nevertheless hypothesized that the use of physical force is "the employing of that mechanism knowingly as a device to cause physical harm," *id.* (alteration and internal quotation marks omitted), given the realistic probability determination, the Fourth Circuit's speculation about omission liability under the ACCA was dicta, a conclusion further buttressed by Judge Motz's concurrence and skepticism regarding that portion of the majority opinion. Similarly, in *United States v. Waters*, the Seventh Circuit minimally engaged with the question of omission, offering only one line:

17

"Likewise, withholding medicine causes physical harm, albeit indirectly, and thus qualifies as the use of force under *Castleman*." 823 F.3d 1062, 1066 (7th Cir. 2016). Additionally, the Illinois statute at issue in *Waters* was enhanced domestic battery, which definitionally required "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions," *id.* at 1065 (citation and internal quotation marks omitted), suggesting a level of force contemplated by *Johnson*. As with *Rumley*, the Seventh Circuit's one line contemplating the hypothetical of withholding medicine is better interpreted as dicta.

Despite the majority's best attempts here to characterize the previous decisions in the history of this case as illogical aberrations, the district court and the original *Scott* panel were far from alone in concluding that crimes of omission definitionally cannot be a violent crime. In *United States v. Resendiz-Moreno*, the Fifth Circuit reversed a district court for a sentencing enhancement based on the "use of physical force" component of the Guidelines' definition of a "crime of violence." 705 F.3d 203, 206 (5th Cir. 2013), *overruled in part by United States v. Reyes-Contreras*, 910 F.3d 169, 187 (5th Cir. 2018). The court acknowledged that an "act of omission . . . does not involve the use of physical force." *Resendiz-Moreno*, 705 F.3d at 205 (footnote omitted). *Reyes-Contreras* partially overruled *Resendiz-*

18

*Moreno* by holding that indirect force may still qualify as physical force. *See*

*Reyes-Contreras*, 910 F.3d at 187. Nevertheless, *Reyes-Contreras* noted that

"*Castleman* does not address whether an omission, standing alone, can constitute

the use of force." *Id.* at 181 n.25. Additionally, in a summary order, the Ninth

Circuit concluded that North Carolina's crime of involuntary manslaughter,

which may be committed by omission, could not constitute a crime of violence

under the Guidelines because "[l]ogically, one cannot use, attempt to use or

threaten to use force against another in failing to do something." *United States v.*

*Trevino-Trevino*, 178 F. App'x 701, 703 (9th Cir. 2006). Finally, the Third Circuit

has also held that "the use of physical force required by the ACCA cannot be

satisfied by a failure to act." *United States v. Mayo*, 901 F.3d 218, 230 (3d Cir.

2018). In *Mayo*, the statute at issue was Pennsylvania's aggravated assault, which

encompasses "serious bodily injury" due to a defendant's "deliberate failure to

provide food or medical care." *Id.* at 227 (citation omitted). Although the Third

Circuit acknowledged other circuits' conclusions to the contrary, it ultimately

found their holdings unpersuasive because "they conflate an act of omission

19

with the use of force, something that *Castleman*, even if it were pertinent, does not support." *Id.* at 230.[8] The same is true here.

It is also true that many crimes with potentially violent impact have been analogously disqualified as ACCA predicates, precisely because the act does not seek to include all criminal acts resulting in injury or fatality but rather particularly violent conduct that requires the use of substantial force. It therefore follows—and is commensurate with the purpose of the ACCA (notably, the "*Armed Career* Criminal Act")—that the law would seek to impose a mandatory minimum sentence of 15 years on some, but not all, defendants whose actions culminated in serious injury or death to an individual. In *Lofton v. United States*, the Eighth Circuit held that Illinois aggravated criminal sexual abuse did not constitute a predicate conviction under the ACCA because "a defendant can violate this statute by having a child touch him for sexual gratification, an act that does not necessarily require 'the use, attempted use, or threatened use of physical force against the person of another.'" 920 F.3d 572, 576 (8th Cir. 2019) (citing 18 U.S.C. § 924(e)(2)(B)(i)). By summary order, the Sixth Circuit held that Tennessee aggravated assault, which may be completed by failing to protect a

---

[8] The *Mayo* holding is under en banc review in *United States v. Harris*, No. 17-1861 (3d Cir.) (argued Oct. 16, 2019).

child or adult from aggravated assault, failed to constitute a predicate conviction pursuant to the ACCA. *See Dunlap v. United States*, 784 F. App'x 379, 389 (6th Cir. 2019).[9]

I would hold that the statutory context of the ACCA and applicable precedent indicates that Section 125.20(1) is not a violent felony. That answer is not a judgment on Scott's actions, but rather a consequence of the ACCA's limited scope.

**III.    The Majority's Holding Unnecessarily Expands the Applicability of Harsh Mandatory Minimum Sentences.**

The majority warns that upholding the district court and original panels' conclusions would hamstring sentencing courts from being able to appropriately punish repeatedly violent criminals. That is not true. The previously discussed guardian-ward example illuminates the relatively minimal impact of the consequences of the original holding. Contrary to the majority's alarmist

---

[9] These cases are obviously not directly comparable to the present circumstances, and I do not rely on them in interpreting the statutory text at issue. They instead illustrate that many crimes we view to be abhorrent and "violent" in the common understanding of the word nevertheless do not qualify as predicate crimes under the ACCA because the purpose of the statute is to further discourage certain kinds of criminal acts, not necessarily to protect all kinds of victims.

concerns, the New York crime of murder is not at issue here, and the predicate question whether murder may be committed by omission in New York has not been briefed or formally discussed.

More importantly, the majority itself references the very statute that ensures that sentencing courts have great latitude to penalize repeat violent offenders as needed. Federal sentencing law instructs district courts to consider "the history and characteristics of the defendant," 18 U.S.C. § 3553(a), and explicitly places "[n]o limitation . . . on the [consideration of] information concerning the background, character, and conduct of a person convicted of an offense," *id.* § 3661. Appellate courts review sentencing decisions based on these factors for abuse of discretion, providing sentencing courts with a significant amount of deference even when they impose a sentence outside of the Guidelines range. *See Gall v. United States*, 552 U.S. 38, 47 (2007) (rejecting "an appellate rule that requires extraordinary circumstances to justify a sentence outside the Guidelines range" (internal quotation marks omitted)). In doing so, appellate courts recognize "the institutional advantages of district courts" and "the expertise of district judges," who face the defendant in person and are

familiar with the contours of the case. *United States v. Stewart*, 590 F.3d 93, 135 (2d Cir. 2009) (internal quotation marks omitted).

In other words, we trust district courts to appropriately sentence repeatedly violent offenders, whether their prior convictions qualify as an ACCA predicate crime or not. The import of the majority's holding is not to give district courts the tools needed to sentence individuals who pose a danger to society; those tools exist plentifully. Instead, it expands the blanket coverage of mandatory minimum sentences. As amici curiae remind us, mandatory minimum sentences suffer from numerous flaws. They encourage prosecutors to pursue the highest possible charge, further exacerbating the power imbalance between the government and criminal defendants during plea negotiations, create "sentencing cliffs," sharp sentencing variations based on the technicalities of an individual's criminal record and not on the actual underlying conduct, and lead to excessive costs in building, sustaining, and expanding an already massive prison system. *See* Brief for Families Against Mandatory Minimum & New York State Association of Criminal Defense Lawyers as Amici Curiae Supporting Defendant-Appellee at 11-19.

Federal district court judges have also bemoaned the consequences of mandatory minimum statutes. *See Mandatory Minimums in Drug Sentencing: A Valuable Weapon in the War on Drugs or a Handcuff on Judicial Discretion?*, 36 AM. CRIM. L. REV. 1279, 1284 (1999) (statement of Sporkin, J., D.D.C.) ("[I]t's a terrible thing that we're doing with mandatory minimums. . . . [W]e're putting more people in prisons, we're building more prisons, it's costing us tremendous amounts of money. So that is inconsistent with this concept that it is curtailing crime." (footnote omitted)); *see also* Carrie Johnson & Marisa Peñaloza, *Judge Regrets Harsh Human Toll of Mandatory Minimum Sentences*, NPR (Dec. 16, 2014 4:03 AM), https://www.npr.org/2014/12/16/370991710/judge-regrets-harsh-human-toll-of-mandatory-minimum-sentences (comments of Gleeson, J., E.D.N.Y) ("[It] . . . turns out that policy [of creating mandatory minimum sentences] is wrong. It was wrong at the time. . . . Mandatory minimums, to some degree, sometimes entirely, take judging out of the mix[.] . . . That's a bad thing for our system." (internal quotation marks omitted)). So too has the United States Sentencing Commission itself. *See* Press Release, U.S. Sent'g Comm'n, Senate Judiciary Committee Votes in Favor of the Sentencing Reform and Corrections Act of 2015 (Oct. 22, 2015) ("The Commission has extensively researched the

issue of mandatory minimum penalties and, in its 2011 report to Congress, found they were often too severe, swept too broadly, and were applied inconsistently.") (available at https://www.ussc.gov/about/news/press-releases/october-22-2015).

I accordingly find the majority's concerns about under-penalizing murderers unconvincing. Ample tools exist for sentencing courts to appropriately punish repeatedly violent offenders. Although the ACCA is one such tool, it targets "a very small percentage of repeat offenders" that account for "a large percentage of crimes of theft and violence." *Taylor v. United States*, 495 U.S. 575, 581 (1990) (internal quotation marks omitted).[10] Therefore, it is entirely logical that crimes of omission would not fall within the scope of the conduct the ACCA seeks to penalize.

---

[10] One response may be that Scott is precisely such a defendant. However, the categorical approach prohibits the consideration of his individual acts. The Supreme Court chose this method for good reason. *See Descamps v. United States*, 570 U.S. 254, 270 (2013) (explaining that, without the categorical approach, courts would have to scour "documents for evidence that a defendant admitted in a plea colloquy, or a prosecutor showed at trial," resulting in "uncertain" or "downright wrong" understandings of the facts at issue); *see also id.* at 270-71 (explaining that defendants may let certain statements go unchallenged "because it was irrelevant to the proceedings," not realizing that "his silence could come back to haunt him in an ACCA sentencing 30 years in the future").

**IV. Lenity Further Supports Affirmance.**

The rule of lenity is a "time-honored interpretive guideline that uncertainty concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Kozminski*, 487 U.S. 931, 952 (1988) (collecting cases). The purpose of the rule is "to promote fair notice to those subject to the criminal laws, to minimize the risk of selective or arbitrary enforcement, and to maintain the proper balance between Congress, prosecutors, and courts." *Id.* The rule of lenity is "perhaps not much less old than the task of statutory construction itself." *United States v. Davis*, 139 S. Ct. 2319, 2333, 204 L.Ed.2d 757 (2019) (internal quotation marks omitted) (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820) (Marshall, C.J.)).

True, "the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Castleman*, 572 U.S. at 172-73 (internal quotation marks omitted). The majority concludes that nothing about the statutory text, history, or purpose leaves any ambiguity. Yet, a district court judge, a majority of the original appellate panel, and other circuit courts have all concluded that it is, at minimum, unclear

26

whether Congress intended to include crimes committed by omission within the force clause of the ACCA. Although Congress noted that "murder, rape, assault, [and] robbery" were crimes "involving physical force," H.R. Rep. No. 99-849, at 3 (1986), it did not include manslaughter. And, as previously discussed, it also articulated that the ACCA was meant to target a "very small percentage of repeat offenders." *Taylor*, 495 U.S. at 581 (internal quotation marks omitted).

Even if the majority remains unconvinced of the original panel's interpretation of the force clause, there is significant doubt that Congress contemplated manslaughter by omission as one of the hallmark crimes committed by these repeat offenders. It is entirely probable that Congress did not consider the archetype of the malicious guardian, given that its focus at the time was what it considered "the most damaging crimes to society," such as repeated incidents of armed burglary, which "involves invasion of victims' homes or workplaces, violation of their privacy, and loss of their most personal and valued possessions." *Id.* (internal quotation marks omitted). Accordingly, Congressional intent is "grievous[ly]" ambiguous as to the concept of omission liability in this context. *Castleman*, 572 U.S. at 173.

The statute further fails to instruct courts whether "physical force" pertains to the criminal conduct itself or the ultimate impact on the victim, a silence the majority itself recognizes. 18 U.S.C. § 924(e)(2)(B)(i). While many experienced jurists read the text and Congressional history to mean the former, others read the latter. This is a textbook example of where the rule of lenity should apply. There is clearly "reasonable doubt . . . about [the ACCA's] intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *United States v. Valle*, 807 F.3d 508, 523 (2d Cir. 2015) (citation, italics, and internal quotation marks omitted). At minimum, the rule of lenity instructs us to resolve these doubts in favor of Scott.

**V.     The Sentencing Guidelines**

The government continues to argue that Scott would be subject to a "career offender" classification under Guidelines Section 4B1.2(a). The majority does not reach this issue, nor does it need to, since its interpretation of the force clause seals Scott's fate. However, for Scott to succeed—as he did twice before—he must win on this argument as well. The original panel's reasoning on the Guidelines is largely still applicable to the issues raised on en banc review. *See*

28

*Scott*, 954 F.3d at 87-92. However, I briefly address some of the government's arguments here.

The Guidelines consider a "career offender" a defendant who at eighteen years old or older has committed a felony that is "either a crime of violence or a controlled substance offense" and "has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). The Guidelines define a "crime of violence" as either a crime involving "the use, attempted use, or threatened use of physical force against the person of another, or . . . murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm." *Id.* § 4B1.2(a). Although I disagree with the outcome, I agree with the majority that the force clause in the Guidelines is subject to the same analysis as the force clause of the ACCA. Therefore, what remains at issue is whether New York Penal Law Section 125.20(1) qualifies as any of the enumerated offenses. To answer the question, we must use the categorical approach to determine whether the statute criminalizes the same or a narrower crime than the "generic" version of any listed offense. *Scott*, 954 F.3d at 88. The "generic"

version of the offense is the "sense in which the term is now used in the criminal codes of most States." *Taylor*, 495 U.S. at 598.

The government renews its argument that the conduct described in Section 125.20(1) qualifies as either "murder" or "voluntary manslaughter" and an aggregation of the two counts would yield a majority of states criminalizing conduct encompassed by Section 125.20(1).[11] However, to read the enumerated offenses clause in this way would be to ignore its distinct structure. Whereas the force clause categorizes crime by type of conduct, the enumerated offenses clause lists them by individual crime, which in our legal system, correlates to a certain set of elements. The approach for which the government advocates is better suited for a residual clause analysis, not a distinct list of offenses.[12] Nor does the enumerated offenses clause list "homicide" as a qualifying offense; if that were

---

[11] Eight states define "manslaughter" as causing death with intent to do serious bodily injury: Connecticut, Delaware, New York, Minnesota, North Carolina, Rhode Island, Kentucky, and Michigan. Twenty states include conduct that demonstrates an intent to do serious bodily injury under "murder" or "felony murder." Each individual count yields a minority of states, so the government argues for an aggregation of the two categories.

[12] A previous version of the Guidelines did include a residual clause including "conduct that presents a serious potential risk of physical injury to another," which the Sentencing Commission removed in the August 2016 publication of the Guidelines. *United States v. Castillo*, 896 F.3d 141, 145 n.7 (2d Cir. 2018) (internal quotation marks omitted).

the case, grouping various types of homicide crimes might be an acceptable approach. In the absence of these structures, the enumerated offenses should not be counted together. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) (explaining that courts should be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law" (internal quotation marks omitted)).

It is true that *Taylor* instructs us to disregard "technical definitions and labels under state law" when employing the categorical approach in this context. *Taylor*, 495 U.S. at 590. Perhaps this line from *Taylor* would be significant if the government could show that most states label the equivalent of conduct criminalized by Section 125.20(1) as "murder." Then, the issue could arguably be one of mere labels or semantics. But by the Government's own count, one minority group of 20 states defines this conduct as "murder" or "felony murder," and another, even smaller minority group of eight states considers it "manslaughter." No majority consensus exists as to whether the conduct underlying Section 125.20(1) qualifies as either crime. This goes beyond "technical definitions and labels," *id.*, and instead reaches the heart of the question—whether Section 125.20(1) fits "the generic sense in which [the

31

enumerated] term[s are] now used in the criminal code of most States," *id.* at 598.

It does not; therefore, Section 125.20(1) is neither generic murder nor generic voluntary manslaughter.

The government also renews its argument that Section 125.20(1) is generic aggravated assault. But the government continues to face the same problem as before; they have not shown that most states criminalize aggravated assault by omission. *See Scott*, 954 F.3d at 91-92. In its briefs, the government purports to cite at least 28 states that apply omission liability to their aggravated assault crimes. A closer review of their citations yields no such answer. The government's statutory citations are definitional statutes that merely define the word "omission." New York Penal Law Section 125.20(1) is not punishable by omission because the New York Penal Code defines what omission liability is; it is so because the New York Court of Appeals has repeatedly applied that form of liability to the statute. *See Wong*, 81 N.Y.2d at 606, 608; *Steinberg*, 79 N.Y.2d at 680. By contrast, at most five of the government's cited cases apply omission liability to their aggravated assault statute.[13]

---

[13] *Compare Steinberg*, 79 N.Y.2d at 673 (applying omission liability specifically to the crime of New York first-degree manslaughter) *with, e.g.*, *Snow v. State*, 568 S.W.3d 290, 295 (Ark. Ct. App. 2018) (applying omission liability to first-degree

The government also purports to cite case law for "11 additional states [that] recognize omission as a basis for criminal culpability in their case law." Gov't's Br. at 50-51 (footnote omitted). Again, this broad assertion does not show that omission is commonly a basis for aggravated assault. In any event, 11 states are not a majority. After having parsed through those citations, too, only three appear somewhat relevant to aggravated assault or battery crimes. The remaining eight deal with murder, manslaughter, or state child abuse crimes, not aggravated assault.[14]

---

endangering the welfare of a child); *People v. Stewart*, 55 P.3d 107, 116 (Colo. 2002) (applying omission liability to "second degree reckless assault"); *Ex Parte Lucas*, 792 So. 2d 1169, 1170-71 (Ala. 2000) (applying omission liability to murder); *State v. Williams*, 484 P.2d 1167, 1170, 1172 (Wash. Ct. App. 1971) (applying omission liability to negligent manslaughter).

[14] *See Zemek v. Superior Court*, 257 Cal.Rptr.3d 729, 735, 744-45 (Cal. Ct. App. 2020) (explaining that murder or manslaughter may be committed by omission and affirming deficient caretaker's convictions for murder, elder abuse, and grand theft); *Commonwealth v. Riley*, 7 N.E.3d 1060, 1079 (Mass. 2014) (explaining that failure to act on parental duties to care for children "can constitute murder or involuntary manslaughter" (citation and internal quotation marks omitted)); *State v. Robat*, 49 A.3d 58, 60, 80 (R.I. 2012) (affirming conviction for second-degree murder based on failure to obtain medical care for a newborn); *Simpkins v. State*, 596 A.2d 655, 655, 659-62 (Md. Ct. Sp. App. 1991) (outlining history of murder and manslaughter convictions based on failure to care for children), *superseded by rule on other grounds as recognized in State v. Brown*, 211 A.3d 335, 350 (Md. 2019); *State v. Peters*, 780 P.2d 602, 603, 605-06 (Idaho Ct. App. 1989) (explaining that parents may be guilty of "criminal homicide" for failing to provide adequate care for their children); *State v. Valley*, 571 A.2d 579, 584-85 (Vt.

In sum, a careful review of the government's citations reveals, at most, eight states that may apply omission liability to aggravated assault. Therefore, the government has failed to show that Section 125.20(1) falls within any enumerated offense articulated in Guidelines Section 4B1.2(a), and Scott does not qualify as a "career offender."[15]

**VI. Conclusion**

The majority takes issue with the sometimes unsatisfying results yielded by the modified categorial approach when viewed through the lens of one defendant's individual record. They are far from the first federal judges to

---

1989) (applying omission liability to involuntary manslaughter); *State v. Eagle Hawk*, 411 N.W.2d 120, 121, 123-24 (S.D. 1987) (affirming convictions for state felonies of abuse of or cruelty to a minor based on failure to obtain or provide adequate care); *Biddle v. Commonwealth*, 141 S.E.2d 710, 714 (Va. 1965) (explaining that willful omission of a parental duty constitutes murder and neglectful omission constitutes manslaughter).

[15] The Sixth Circuit reached a similar conclusion regarding the generic definition of aggravated assault. In *United States v. Cooper*, the Sixth Circuit explained that a Tennessee offense labeled "aggravated assault" is broader than generic aggravated assault—and therefore not a crime of violence under the Guidelines—in part because "it punishes a parent's failure to prevent an aggravated assault against his or her child." 739 F.3d 873, 880 (6th Cir. 2014). Additionally, LaFave describes aggravated assault in a few different ways, including "assault with intent to murder" or "assault with a dangerous or deadly weapon," but nowhere suggests that it may be committed by omission. LAFAVE § 16.3(d) (footnotes, alteration, and internal quotation marks omitted).

express frustration with this form of analysis, as indicated by one of the concurring opinions' numerous citations on this point. But the Supreme Court continues to stand by the approach, and has articulated good reasons for doing so, including conservation of resources and fairness to defendants. *See Descamps*, 570 U.S. at 270-71. Regardless of one's views on the efficacy of the categorial approach, we may not unilaterally overthrow it. Nor is it within our authority to reactively convolute it, placating our sensibilities when they are offended by the acts of a particular defendant. We are instead bound to uphold the law prescribed by Congress and interpreted by the Supreme Court.

Under that law, the correct answer is that Scott does not qualify for a mandatory minimum under 18 U.S.C § 924(e)(2)(B) or a career offender designation under the Guidelines. I do not reach this conclusion lightheartedly, nor did I when I originally heard the case. Scott is a legally and morally culpable individual, and his very serious crimes have had very serious consequences. My conclusion about his sentence is the outcome of an elemental analysis repeatedly affirmed by the Supreme Court since its decision in *Taylor*, 495 U.S. at 600-02, published over thirty years ago. Had Congress wanted to reverse course and achieve different outcomes, it could have. Had the Supreme Court wanted to

revisit its interpretation of the ACCA, it could have. But they have not, and it is not on us to bend statutory text out of context, imposing a superficial sense of justice.

I therefore must respectfully dissent from today's interpretation of these statutes and the likely consequence of sending Scott back to prison, forcing him to serve additional time after he has already been freed and keeping him in the shadow of past crimes for which he has already served the sentence imposed.